946 A.2d 668

**COMMONWEALTH of Pennsylvania, ex rel., PENNSYLVANIA ATTORNEY GENERAL Tom CORBETT and Philadelphia District Attorney Lynne Abraham, Petitioners**

**v.**

**Deborah Shelton GRIFFIN, Respondent.**

Supreme Court of Pennsylvania.

Argued March 5, 2008.

Decided May 6, 2008.

550

Barry Noah Kramer, Esq., PA Office of Attorney General, Ronald Eisenberg, Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Samuel C. Stretton, Esq., Law Office of Samuel C. Stretton, West Chester, for Deborah Shelton Griffin.

CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Justice SAYLOR.

The Pennsylvania Attorney General and the Philadelphia County District Attorney have filed a petition in *quo warranto* directed to this Court's original jurisdiction, naming Judge Deborah S. Griffin of the Philadelphia Municipal Court as Respondent, and seeking her removal from office. The primary issue raised is whether Respondent's felony convictions for fraudulently procuring a credit card constitute "infamous crimes" for purposes of Article II, Section 7 of the Pennsylvania Constitution, which prohibits anyone convicted of such an offense from holding an office of trust or profit in the Commonwealth.

In 1984, federal prosecutors obtained a criminal indictment against Respondent, charging her with various felony counts for using a false social security number on several credit card applications. Additionally, she was charged with using a false social security number on an employment application. Respondent pled guilty to two of these counts, and the remaining ones were dismissed on the consent of the Government. The federal sentencing court suspended the imposition of Respondent's prison sentence, placed her on concurrent three-year terms of probation for each count, and ordered her to pay restitution totaling approximately $1,200.00. *See generally Office of Disciplinary Counsel v. Griffin*, 535 Pa. 590, 591–93, 637 A.2d 266, 266–68 (1994) (*per curiam*) (Papadakos, J., dissenting) (discussing Respondent's federal offenses).[1]

1. In the *Office of Disciplinary Counsel* case, this Court suspended Respondent from practicing law in Pennsylvania for two years because,

■ Respondent was eventually elected to serve as a judge of the Philadelphia Municipal Court, and began serving in that position in January 2002; she was retained for a second six-year term in the November 2007 municipal election. At some point during Respondent's first term in office, the Judicial Conduct Board became aware of her felony convictions, and referred the matter to Petitioners. In its referrals, the Board expressed its view that it lacked jurisdiction to pursue any charges against Respondent before the Court of Judicial Discipline because the crimes occurred prior to her taking office. Petitioners, however, declined to take action and suggested instead that the Board may have standing in its own right to seek *quo warranto* relief.[2]

The Judicial Conduct Board subsequently filed an application for leave to file original process and complaint in *quo warranto* with this Court. In its complaint, the Board requested that Respondent be declared unqualified for the office of Judge of the Philadelphia Municipal Court, be ousted from the office, and be permanently prohibited from occupying or holding herself out as occupying such office and from receiving any compensation, expense, reimbursement, or other emolument of office. This Court ultimately dismissed the claim, concluding that, although it had jurisdiction to address an action in *quo warranto* challenging a Philadelphia municipal court judge's right to hold office, the Judicial Conduct Board lacked standing to pursue the matter. *See Commonwealth ex rel. Judicial Conduct Bd. v. Griffin (Griffin I)*, 591 Pa. 351, 918 A.2d 87 (2007); *see also* 42 Pa.C.S. § 721(3) (affording this Court "original but not exclusive" jurisdiction over *quo warranto* cases as to officers of statewide jurisdiction).

among other things, she falsely stated in her 1988 application for admission to the Pennsylvania Bar that she had never been arrested or prosecuted for any crime. *See also Matter of Griffin*, 548 Pa. 538, 699 A.2d 715 (1997) (*per curiam*) (reinstating Respondent to the practice of law).

2. *Quo warranto* is the proper means by which to test title or right to public office. *See In re Bd. of Sch. Dirs. of Carroll Township*, 407 Pa. 156, 157–58, 180 A.2d 16, 17 (1962).

 The Commonwealth, on relation of the Petitioners herein, then initiated the present action on August 15, 2007, by filing an application for leave to file original process, which was granted, and a complaint in *quo warranto*. In its complaint, the Commonwealth requested a declaration that, by virtue of Respondent's federal convictions for *crimen falsi* felony offenses, Article II, Section 7 of the Pennsylvania Constitution bars her from holding office as a judge of the Philadelphia Municipal Court.[3] That section provides in full:

> No person hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth.

PA. CONST. art. II, § 7. Since Respondent was not convicted of embezzlement, bribery, or perjury, the central issue is whether the crimes of which she was convicted were constitutionally "infamous." Although this *quo warranto* litigation was initiated by Petitioners, Respondent bears the burden of proving her right to continue in office. *See In re Stout,* 521 Pa. 571, 576, 559 A.2d 489, 492 (1989).

 Respondent asserts, as a threshold matter, that she was never convicted of any crime because her federal prison sentence was suspended and she was instead required to serve a term of probation. However, the mere suspending of a defendant's prison sentence does not nullify the underlying conviction. As Respondent acknowledges, the applicable federal statute clarifies that such a suspension may only occur upon the entry of a "judgment of conviction." Brief for Respondent at 34 (quoting 18 U.S.C. § 3651 (repealed)). Indeed, a sentence of probation is a criminal sentence in the federal system, both as a general matter, *see* 18 U.S.C. § 3563(b)(1), and when it is imposed in place of a suspended prison sentence. *See* 18 U.S.C. § 3651 (repealed); *see also Berman v. United States,* 302 U.S. 211, 213, 58 S.Ct. 164, 166,

---

**3.** The Commonwealth also sought a declaration that the Article II, Section 7 bar prevented Respondent from standing for retention in the November 2007 municipal election. That request is now moot as the election has occurred and Respondent was retained and sworn in for a second term on the bench.

82 L.Ed. 204 (1937) ("Placing petitioner on probation did not affect the finality of the judgment. Probation is concerned with rehabilitation, not with the determination of guilt."). Accordingly, Respondent's argument in this regard lacks merit.

▮ Addressing the central issue in this matter, Respondent concedes that the offenses to which she pled guilty were felonies, *see* Brief for Respondent at 19, but she maintains that the proscription of Article II, Section 7 does not apply to those crimes because they did not affect the public administration of justice. She acknowledges recent precedent from this Court which she interprets as holding that any felony or *crimen falsi* offense constitutes a constitutional basis for removal from office under Article II, Section 7, *see id.* at 20 (citing *Commonwealth ex rel. Baldwin v. Richard*, 561 Pa. 489, 751 A.2d 647 (2000)); however, she suggests that the rationale underlying that case should be reconsidered because it would mean—particularly as to felonies—that the mere grading of the offense by the legislature would be determinative. She states, in this regard, that one of the offenses of which the officeholder in *Richard* was convicted has since been upgraded to a felony, and suggests that the result of that case would be different if decided today. Arguing that the inclusion of all felonies and *crimen falsi* offenses within the constitutional classification therefore "appears to go too far," Respondent urges that such crimes should only be considered as prohibiting the holding of public office if they undermine the administration of justice. Indeed, Respondent proffers that this comports with the interpretation of "infamous crimes" as set forth by this Court in the seminal decision of *Commonwealth v. Shaver*, 3 Watts & Serg. 338, 1842 WL 4918 (Pa.1842), in which the Court, according to Respondent, clarified that, unless the administration of justice was undermined, a felony or *crimen falsi* offense would not qualify as "infamous." Finally, Respondent argues that there is nothing about the felonies to which she pled guilty that affects the administration of justice or undermines the public trust because her use of a false social security number to obtain credit cards oc-

curred within the framework of a private commercial transaction. *See id.* at 23.

In *Shaver,* after a thorough historical review, this Court ultimately described the category of infamous offenses as follows:

> The offenses which disqualify a person to give evidence, when convicted of the same, are treason, felony, and every species of the *crimen falsi*—such as forgery, subornation of perjury, attaint of false verdict, and other offenses of the like description, which involve the charge of falsehood and affect the public administration of justice.

*Id.,* 1842 WL 4918 at *4.[4] As noted, based upon this passage, Respondent contends that any felony which forms the basis of a valid *quo warranto* action must be one that undermines the public administration of justice.

Contrary to Respondent's argument, in the years since *Shaver* was decided this Court has consistently adhered to an interpretation in which felonies and *crimen falsi* offenses are distinct (albeit overlapping) categories, both of which contribute to the definition of infamous crimes. This understanding is exemplified by cases as old as *Schuylkill County v. Copley,* 67 Pa. 386, 390 (1871) ("Infamous crimes are treason, felony, ... and offenses affecting the public administration of justice, such as bribing a witness to absent himself, and not to give evidence ...."), and as recent as *Richard,* 561 Pa. at 497–98, 751 A.2d at 652 ("[W]e find that it is the *Shaver* classification referring to infamous crimes as felonies and *crimen falsi* offenses, and not the juror disqualification language, which has been followed for over one hundred fifty years in this Com-

---

4. Although this passage facially relates only to disqualification as a witness in court, *Shaver* determined that the classification as recited constituted the category of offenses that were constitutionally infamous for purposes of disqualification from public office pursuant to the relevant provision of the Pennsylvania Constitution then in effect—namely, Article VI, Section 9. While the present Article II, Section 7 varies somewhat in its phraseology, the portion relating to disqualification from office premised upon conviction of an infamous crime is not substantively different, *see In re Greenberg,* 442 Pa. 411, 417 n. 10, 280 A.2d 370, 372 n. 10 (1971), and, thus, the *Shaver* formulation has been utilized in the modern era, as further developed infra.

monwealth."), and Respondent does not provide any compelling basis to depart from the general requirements of *stare decisis* on this principle.

This also comports with the understanding of the term "infamous" at common law. As one commentator has observed:

> [U]nder the early common law certain crimes were called "infamous" on account of the shameful status which resulted to the person convicted of one of them. *Crimes which were regarded as infamous were treason, felonies, any offense tending to pervert the administration of justice, and such crimes as came within the general scope of the term "crimen falsi" of the Roman law,* such as perjury, subornation of perjury, barratry, conspiracy, swindling, cheating, and other crimes of a kindred nature.

M.C. Dransfield, Annotation, *What is an Infamous Crime or One Involving Moral Turpitude Constituting Disqualification to Hold Public Office*, 52 A.L.R.2 D 1514, § 2(a) (emphasis added).[5]

Furthermore, that the three examples given—forgery, subornation of perjury, and attaint of false verdict—are all *crimen falsi* offenses supports the position that the qualifying language in *Shaver* (relating to "involv[ing] the charge of falsehood and affect[ing] the public administration of justice") was only meant to apply to the last item (i.e., "every species of the *crimen falsi* "). Indeed, the logical extension of Respondent's argument would mean that treason, as well, would only be considered infamous if it undermined the public administration of justice. Finally, the interpretation urged by Respondent would render *Shaver's* use of the term "felony" superflu-

---

5. *Accord People ex rel. Keenan v. McGuane,* 13 Ill.2d 520, 150 N.E.2d 168, 176 (1958) ("[W]e conclude that any public officer convicted ... of a felony which falls within the general classification of being inconsistent with commonly accepted principles of honesty and decency, or which involves moral turpitude, stands convicted of an infamous crime under the common law as interpreted when our constitution was adopted in 1870, and that such conviction creates a vacancy in such office."). *See generally* BLACK'S LAW DICTIONARY 371 (6th ed.1990) (defining "infamous crime" to include "treason, felony, and the *crimen falsi.*").

ous, because all crimes that "involve the charge of falsehood and affect the public administration of justice" are *crimen falsi*. *See generally Commonwealth v. Jones*, 334 Pa. 321, 323, 5 A.2d 804, 805 (1939) (explaining that *crimen falsi* necessarily entails an element of falsehood, and includes "everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud" (internal quotation marks omitted)).

■ Nor do we find it untoward that the status of a particular offense may change from misdemeanor to felony (or vice versa) as a result of legislation. As recognized by *Shaver*, the constitutional prohibition is triggered only by a conviction, and not by the mere fact of dishonest, or even criminal, conduct. This, in turn, implies that the framers of the Constitution intended that the law in force at the time of the conviction should determine whether the crime was infamous. *See Shaver*, 1842 WL 4918 at *3; *accord Richard*, 561 Pa. at 499, 751 A.2d at 653. Furthermore, our General Assembly, as a representative, political branch of government, sets public policy, which this Court enforces, subject to constitutional limitations. *See Program Admin. Servs., Inc. v. Dauphin County ·Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007). Thus, the Legislature's determination as to whether a particular offense is serious enough at a given time to warrant the status of felony reflects the public will as expressed through the ballot box, and this determination properly controls whether the offense in question was constitutionally infamous at the time of the officeholder's conviction.

■ Even were we to disregard the felony status of Respondent's convictions, her case would not be substantially aided. There is no dispute that· her offenses were *crimen falsi* and, as the Commonwealth correctly points out, such offenses—when committed by an official ultimately imbued with the public trust—have broadly been viewed to undermine the public administration of justice. For example, in *In re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971), a case that seems particularly relevant here, this Court applied the *Shaver* rule

to a common pleas judge who had been convicted in federal court of mail fraud. *See id.* at 417, 280 A.2d at 372–73 ("Without suggesting that [the *Shaver*] definition is sufficiently inclusive for the modern era, we have no hesitation in holding that the federal crime of using the mails to defraud is clearly within the ambit of [that] classification.").[6] Like Respondent, Judge Greenberg's actions occurred before he became a member of the bench, and thus, did not directly affect his judicial activities as such. Nevertheless, observing that the purpose of removal from office was not to punish the jurist but to maintain the integrity of the judicial office, the *Greenberg* court determined that allowing the judge to continue in office would prejudice the proper administration of justice. *See id.* at 415, 280 A.2d at 371–72. Expanding on this precept, *Greenberg* continued:

"The place of justice is a hallowed place; and therefore not only the bench but the foot-pace and precincts, and purprise thereof ought to be preserved without scandal and corruption...." So spoke Sir Francis Bacon in the 16th Century. For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest.

*Greenberg,* 442 Pa. at 415–16, 280 A.2d at 372 (quoting Bacon, "Of Judicature," as quoted in Handbook for Judges, 25, 27 (Am.Jud.Soc.1961)).[7] For the reasons articulated in *Green-*

6. In *Greenberg,* this Court entered a *per curiam* order suspending the judge from all activities of his office pending the outcome of his federal appeal. Three Justices issued a memorandum opinion supporting the order in full, and three Justices reasoned that Judge Greenberg should be permitted to perform administrative tasks to help relieve severe docket congestion. All six Justices, however, agreed that the conviction was for an infamous crime under *Shaver.*

7. *See also Richard,* 561 Pa. at 495, 751 A.2d at 650 ("The purpose of removing one from public office under these circumstances is not to punish the officer. Instead, it is to assure the requisite good character of those individuals whom our citizens look to for governance."); *Petition of Hughes,* 516 Pa. 90, 98, 532 A.2d 298, 302 (1987) ("While conviction of an infamous crime does not imply that an offender is incapable of functioning as a respected and productive member of

*berg, Richard,* and *Hughes,* we find that the public trust and the public administration of justice would be adversely affected were Respondent to remain in judicial office, in light of her *crimen falsi* convictions.[8] Accordingly, for this reason, as well as the felony status of her convictions, such convictions must be deemed to fall within the *Shaver* definition of constitutionally infamous offenses.

Respondent next avers that the doctrines of laches, waiver, and estoppel bar relief in this case. Throughout her argument, she uses these three terms together as a unit and does not attempt to distinguish them substantively as separate legal doctrines. The gravamen of her claim, however, goes primarily to the issue of laches.[9] In this respect, she observes that her felony convictions have been a matter of public record since 1984, and that the Philadelphia County District Attorney's office had actual notice of her crimes as far back as 1989, since she had worked in that office and her employment was ultimately terminated when it became known that she had failed to disclose her convictions on her application to the

society, it is irreversible evidence that the offender does not possess the requisite character for public office. It is important to emphasize that we are not concerned here with the standard of compassion which should govern daily interpersonal relationships. We deal, rather with a norm established by our Constitution for those who seek to govern us. Without question, it is a demanding norm." (quoting *State ex rel. Wier v. Peterson,* 369 A.2d 1076, 1080–81 (Del.1976))).

8. As noted, Respondent argues that the public trust was not undermined because her fraudulent activities occurred within the framework of private transactions and, hence, there was no misuse of her office or theft of public funds. She cannot prevail on this basis, however, as the underlying actions in *Greenberg* also affected only private parties. Further, the Commonwealth observes that the fraudulent use of a false social security number has at least some public facet, as it impairs the United States government's system for official identification of its citizens.

9. In her pleadings, Respondent does allege that Petitioners waived their right to bring this action because they declined to do so when initially contacted by the Judicial Conduct Board, as related above. *See* Answer and New Matter at 4. This aspect of the procedural history is addressed below. Respondent does not, however, plead or discuss the concept of estoppel as a separate basis for relief. We note that the doctrine of laches contains an estoppel component in any event, and it is sometimes referred to as "estoppel by laches." *See, e.g., Kindle v. State Bd. of Nurse Exam'rs,* 512 Pa. 44, 48, 515 A.2d 1342, 1344 (1986).

Pennsylvania Bar (*see supra* note 1). Respondent complains that she was prejudiced by Petitioners' delay in bringing the present application for *quo warranto* relief, because she gave up her law practice and expended money to run for office, initially in 1999, and again in 2001. She notes that she also continued to refrain from practicing law when she sought retention in 2007, and emphasizes further that, if she is removed from the bench, she will now have to re-start a law practice "from scratch" because her client base has been transferred elsewhere.

Laches bars relief when the plaintiff's lack of due diligence in failing to timely institute an action results in prejudice to another. Because it is an affirmative defense, the burden of proof is on the defendant or respondent to demonstrate unreasonable delay and prejudice. *See Weinberg v. State Bd. of Exam'rs. of Pub. Accountants*, 509 Pa. 143, 147, 501 A.2d 239, 242 (1985). Thus, "[t]he party asserting laches as a defense must present evidence demonstrating prejudice from a lapse of time . . . [such as] that a witness has died or become unavailable, that substantiating records were lost, or that the defendant has changed [her] position in anticipation the opposing party has waived his claims." *Richard*, 561 Pa. at 496, 751 A.2d at 651. Furthermore, "[t]he question of laches is factual and is determined by examining the circumstances of each case." *Weinberg*, 509 Pa. at 148, 501 A.2d at 242 (quoting *Leedom v. Thomas*, 473 Pa. 193, 200–01, 373 A.2d 1329, 1332 (1977)).

Initially, while laches may be invoked in disciplinary proceedings for professional misconduct, *see Kindle*, 512 Pa. at 48, 515 A.2d at 1344, it is less clear that it should ordinarily be deemed available relative to an Article II, Section 7 *quo warranto* action. The "prohibition against those convicted of infamous crimes from holding public office is a Constitutional mandate," *Richard*, 561 Pa. at 496 n. 10, 751 A.2d at 651 n. 10, and, as noted, the holding of public office implicates the public trust. Because of the need to guard against harm to the public interest, a number of other jurisdictions are cautious

about applying laches in situations such as the present one.[10] Although *Richard* rejected the officeholder's laches claim on the merits, it does not appear that any argument concerning the availability of laches within the context of that case was forwarded to the Court. Thus, we do not read the decision as containing an affirmative holding that laches is always available within the framework of Article II, Section 7 litigation seeking to remove a public official from office based on the commission of infamous crimes.

We do not foreclose the possibility laches may apply in circumstances where there has been gross and unreasonable delay by the government, and allowing an action to proceed under Article II, Section 7 would be injurious to the public welfare or would manifestly subvert the interests of justice. *Accord Junior College Dist. No. 526*, 246 N.E.2d at 294 ("[I]f, as a result of inexcusable delay and public acquiescence, a judgment of ouster would result in great public

10. *See, e.g., State ex rel. Stovall v. Meneley*, 271 Kan. 355, 22 P.3d 124, 149 (2001) (concluding, in the context of *quo warranto* litigation undertaken to remove a county sheriff for giving false sworn testimony, that "laches ... does not apply when a cause of action is brought by the State seeking to protect the public"); *People v. Junior College Dist. No. 526*, 42 Ill.2d 136, 246 N.E.2d 292, 294 (1969) ("Laches will not ordinarily bar an action in quo warranto brought on behalf of the people."). As further developed by a Connecticut appellate tribunal:

> The legality of a public office ... is subject to challenge by quo warranto during the entire period of incumbency. Because of the public's interest in its government by legal public officers, there can be no waiver of quo warranto entitlement by inaction during the passage of time.

*Carleton v. Civil Serv. Comm'n of City of Bridgeport*, 10 Conn.App. 209, 522 A.2d 825, 828 (1987); *accord* 74 C.J.S. Quo Warranto § 39 (2008) ("Laches will not ordinarily bar an action in quo warranto brought on behalf of the people, or where a public interest is involved."); *cf. Mohave County v. Mohave–Kingman Estates*, 120 Ariz. 417, 586 P.2d 978, 982 (1978) (although laches may apply to proprietary acts of the state, it does not apply in matters affecting governmental or sovereign functions); *State v. Gettes*, 321 Md. 671, 584 A.2d 689, 691 (1991) (laches does not apply to the state when it sues in its sovereign capacity in its own courts); *Jennings v. Director of Revenue*, 9 S.W.3d 699, 700 (Mo.Ct.App.1999) (refusing to allow appellant to invoke laches against the state acting in a governmental capacity); *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143, 555 N.E.2d 630 (1990) (noting that it is "well settled" that estoppel does not apply against a state when it is performing a governmental function).

inconvenience and detriment, the public interest requires that laches be applied. . . ."). Consistent with *Richard,* however, we believe that it is appropriate to require a specific and substantial proffer to support an exception to the general rule against laches in this type of case.

As to Respondent's proffer in particular, insofar as she asserts that it is generally more difficult to build a new law practice than to continue a successful one in existence, her argument is certainly plausible—and, indeed, it may be true that she would have been better off financially if she had been permanently precluded from running for office by an immediate and successful *quo warranto* action filed in 1999 when she first sought judicial office. The difficulty, however, is that her allegations concerning any actual prejudice that she suffered are highly generalized and conclusory. For example, Respondent has not provided this Court with any information concerning her prior law practice or the opportunity cost she incurred by serving as a judge. Without a more specific set of averments, they do not equate to the types of proof concerning prejudice that the *Richard* court delineated as a necessary component of a successful laches defense. *Cf.* Reply Brief for Commonwealth at 12 ("In any case, the office of judge is one of honor and responsibility. Many are willing to give up substantial pay in order to serve."). To the extent that Respondent highlights that she spent energy and resources running a campaign for election as judge, moreover, the Commonwealth observes that she fully served out her first term in office, and that she has not stated how much money she expended on her retention effort. As a judge, Respondent has enjoyed the full salary and benefits attaching to that office and this Court cannot determine from the pleadings and briefs whether such compensation was significantly below that which would have been available to her in private practice. *See generally Richard,* 561 Pa. at 496, 751 A.2d at 651 ("Because Appellant fails to present any evidence demonstrating that the alleged delay in instituting the present action caused him prejudice, [the laches] issue is without merit.").[11] Consequent-

11. "Where the time delay is grossly unreasonable, the defendant's burden of proof may be proportionately eased and the 'necessity for

ly, on the present averments, the equities do not favor Respondent's ability to interpose a laches defense.

■ To the degree Respondent's waiver claim is distinct from her laches argument, it is predicated on Petitioners' failure to bring the present action when the Judicial Conduct Board initially contacted them about the matter in 2004 and 2005. As such, unlike the laches claim it does not depend primarily upon an asserted lengthy delay in initiating legal proceedings, but rather, on Petitioners' failure to do so at its first opportunity following their receipt of correspondence from the Board. Respondent argues that their act of deferring to the Board, rather than instituting legal proceedings themselves, manifested their intention to waive their right ever to commence a *quo warranto* action against her.

■ "A waiver in law is the act of intentionally relinquishing or abandoning some known right, claim or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." *Brown v. City of Pittsburgh*, 409 Pa. 357, 360, 186 A.2d 399, 401 (1962) (citations omitted). While it is true that Petitioners declined to take action when initially contacted by the Board, they were relying on the Board's assumed ability to file for *quo warranto* relief in its own right. *See* Respondent's Answer and New Matter, Exh. A (Letter from Philadelphia District Attorney to Judicial Conduct Board, Nov. 4, 2004), Exh. B (Letter from Pennsylvania Attorney General to Judicial Conduct Board, Apr. 28, 2005). Shortly after this Court issued its decision in *Griffin I* clarifying that the Board lacked standing to pursue

specifics regarding prejudice or injury becomes less crucial.' " *Weinberg*, 509 Pa. at 149 n. 3, 501 A.2d at 242 n. 3 (quoting *Gabster v. Mesaros*, 422 Pa. 116, 220 A.2d 639 (1966) (delay of 30 years in instituting action grossly unreasonable so as to lessen burden of proving prejudice), and citing *State Bd. of Medical Educ. & Licensure v. Schireson*, 360 Pa. 129, 61 A.2d 343 (1948) (delay of 34 years in instituting decertification proceedings against medical practitioner raised presumption of practitioner's innocence of charges)). The time interval involved in this controversy is not on the order of those found grossly unreasonable in *Gabster* and *Schireson*; it is, rather, more akin to the seven-year period at issue in *Richard*.

such relief, Petitioners filed the present application. Accordingly, their initial decision to defer to the Board cannot properly be viewed as an intentional relinquishment or abandonment of their right to institute proceedings in the future should the Board be unwilling or unable to act. *See generally Commonwealth ex rel. Corbett v. Large,* 715 A.2d 1226, 1229 (Pa.Cmwlth.1998) ("[T]he Attorney General declined to bring a quo warranto action [initially] because of an internal policy to defer to the local district attorney.... After the district attorney declined to challenge Large, the Attorney General timely proceeded. We find that this internal policy was not the equivalent of a waiver.").[12]

Respondent additionally contends that she cannot be removed from office under Article II, Section 7 of the Constitution because that provision does not apply to sitting judges. Although her argument is somewhat lacking in clarity, it appears to have several parts. First, she maintains that because she was retained for a second term pursuant to the retention process outlined in Article V, Section 15(b), the electorate has already decided the question of whether she should continue in office, thus rendering moot any challenge under Article II, Section 7. Respondent additionally states that the exclusive authority to remove a judge for misconduct is contained in Article V, Section 18(d) of the Pennsylvania Constitution. In this respect, she references the principle that, where two provisions of law are in irreconcilable conflict, the specific one should be construed to prevail over the general one. *See generally* 1 Pa.C.S. § 1933 (setting forth

12. As for the portion of this claim sounding in estoppel, the doctrine contains three elements: "1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; 2) unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting the estoppel; and 3) the lack of a duty to inquire on the party asserting the estoppel." *Chester Extended Care Ctr. v. Department of Pub. Welfare,* 526 Pa. 350, 355, 586 A.2d 379, 382 (1991). Respondent does not identify these factors or make any effort to satisfy them. As her brief contains no substantive argument pertaining to estoppel as such, any claim based upon the estoppel doctrine is waived. *See Commonwealth v. D'Amato,* 579 Pa. 490, 504, 856 A.2d 806, 814 (2004) (finding an issue waived where the litigant's one-sentence argument was so undeveloped that it was the equivalent of no argument at all).

this principle for purposes of statutory construction). She also states that the Article V procedures must be deemed exclusive in order to maintain judicial independence.

The procedure for the electorate to decide whether to retain a judge is wholly separate from the question of whether some other provision of the Constitution affirmatively disqualifies the person from holding office. Thus, the mere fact that the voters retained Respondent in the 2007 municipal election has no bearing on whether Article II, Section 7 precludes her from holding that office on the basis of her convictions for "infamous crimes."

Additionally, Respondent does not explain how judicial independence from the other two branches of government is threatened by an interpretation of Article II, Section 7 in which the phrase "office of trust or profit in this Commonwealth" is understood to include a judicial office. This provision does not give any other branch of government final authority to decide whether a sitting judge may continue in office; although proceedings for removal of a judge under Article II, Section 7 may be instituted by the executive branch, such proceedings, like the present one, are judicial in nature and the final decision rests with the courts. *Cf.* PA. CONST. art. VI, §§ 4–5 (relating to impeachment by the House of Representatives and conviction by the Senate); *id.,* § 6 (making the Governor and "all other civil officers" liable to impeachment); *id.,* § 7 (relating to the removal of civil officers).

Nor does Respondent demonstrate that any irreconcilable conflict exists between Article II, Section 7 and Article V, Section 18(d). The former provision constitutes an absolute bar to holding an office of profit or trust when the individual in question has been convicted of one of the enumerated classes of offense; it applies whether or not the criminal conduct occurred while in office. As discussed, it is not a disciplinary provision designed to impose punishment for misconduct, but a standard of eligibility concerned with ensuring the good character of public officials. The latter provision, on

the other hand, is concerned with discipline. Subsections (a) through (c) of Article V, Section 18 establish the Judicial Conduct Board, the Court of Judicial Discipline, and procedures for review of the decisions of that tribunal. By its terms, subsection (d), on which Respondent relies, is limited to disciplinary action brought "pursuant to this section," i.e., Section 18. PA. CONST. art. V, § 18(d). This provision is also addressed to a broader range of factors affecting the judicial office than that covered by Article II, Section 7. In particular, the relevant subsections state as follows:

(1) A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article [pertaining to prohibited activities]; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court. In the case of a mentally or physically disabled justice, judge or justice of the peace, the [C]ourt [of Judicial Discipline] may enter an order of removal from office, retirement, suspension or other limitations on the activities of the justice, judge or justice of the peace as warranted by the record. . . .

(3) A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office.

(4) A justice, judge or justice of the peace who files for nomination for or election to any public office other than a judicial office shall forfeit automatically his judicial office.

PA. CONST. art. V, § 18(d)(1), (3), (4).

Of additional relevance is that, although subsection (d) allows for lesser punishments than removal from office for certain types of misconduct, it does not preclude a judge's removal pursuant to any other provision of the Constitution.

Accordingly, nothing in Article II, Section 7 is contrary to the substantive provisions of Article V, Section 18(d), and hence, we see no need to invoke the principle that a specific legal provision prevails over a general one when the two conflict irreconcilably.

As a final matter, Respondent states that Article II, Section 7 cannot be applied to members of the Judiciary because the provision is found within the portion of the Constitution pertaining to the Legislature. While this argument has some facial appeal, on closer examination it is unavailing. Article II of the Pennsylvania Constitution is entitled, "The Legislature," and the first six sections deal exclusively with the two Chambers of that body—the Senate and the House of Representatives. Section 7, by contrast, applies more broadly as, by its own terms, it pertains to eligibility both to the General Assembly and to "*any* office of trust or profit in this Commonwealth" (emphasis added). Respondent does not offer any explanation of why a judicial office should not be considered an office of trust within the Commonwealth. Indeed, consistent with the sweeping nature of the text, Section 7 has been broadly applied to other offices besides Member of House or Senate. *See, e.g., Hughes,* 516 Pa. at 95, 532 A.2d at 300 (applying Section 7 to preclude the defendant from holding office on the Philadelphia City Council); *Bolus v. Fisher,* 785 A.2d 174, 175–76 (Pa.Cmwlth.2001) (applying the provision to restrain the litigant from seeking mayoral office). We find, therefore, that the placement of Article II, Section 7 within the portion of the Constitution generally addressed to the Legislature does not prevent its application to officers of the judicial branch of government.

For the reasons stated, we grant in part the relief requested by the Commonwealth. It is ordered that Respondent, Deborah Shelton Griffin, Judge of the Municipal Court of Philadelphia, be and she is hereby removed from that office. Respondent is disqualified from holding that office or any other office of trust or profit in the Commonwealth of Pennsylvania. The Commonwealth's request that Respondent's name be removed

from the retention ballot in the November 6, 2007 municipal election is dismissed as moot.

Chief Justice CASTILLE and Justice McCAFFERY did not participate in the consideration or decision of this case.

Justice EAKIN and BAER and Justice TODD join the opinion.