J-S04012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| EUGENE WATSON, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| CORIZON HEALTH SERVICES, INC., F/K/A PRISON HEALTH SERVICE, | |
| Appellee | No. 339 WDA 2015 |

Appeal from the Order Entered January 27, 2015
In the Court of Common Pleas of Somerset County
Civil Division at No(s): 399 CIVIL 2008

BEFORE:  BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 04, 2016**

Eugene Watson appeals from the trial court's January 27, 2015 order granting summary judgment in favor of Corizon Health Services, Inc., formerly known as Prison Health Services, Inc. ("PHS"), a wholly owned subsidiary of America Services Group, Inc. ("ASG"), and dismissing this action, which was based upon successor liability.  After careful review, we affirm.

On March 29, 2000, Correctional Physician Services, Inc. ("CPS") executed an asset purchase agreement by which it sold a portion of its assets to PHS.  PHS had contracts with the Pennsylvania Department of Corrections to provide healthcare for its correctional facilities in the western district, as well as contracts with the New York State Department of

_____
* Retired Senior Judge assigned to the Superior Court.

Corrections for several facilities located in that state. CPS was a closely-held corporation engaged in providing healthcare services to Pennsylvania correctional facilities in the eastern district, as well as facilities in New York, Virginia, and Florida. By virtue of the asset purchase agreement, PHS acquired only CPS's Pennsylvania and New York contracts.

Prior to the execution of the asset purchase agreement, ASG and its attorneys performed a due diligence review of CPS, which culminated in a memorandum that was submitted to ASG officers and counsel. ASG engaged Ernst & Young LLP to audit CPS and report to its board of directors. It also hired Morgan Keegan to perform a fairness opinion analysis of the asset purchase, and to determine the equity value of CPS's assets. That firm concluded that the equity value of the assets to be purchased ranged from $13 million to $19 million. A schedule appended to that memorandum set forth CPS's disclosures regarding pending and threatened litigation and noted therein that CPS maintained professional liability insurance. Based on the aforementioned due diligence review, PHS negotiated a purchase price of $14 million for the CPS assets. ASG's legal counsel, King and Spalding, supplied a written opinion letter regarding the transaction.

Following the closing, some of the funds were distributed to meet CPS's obligations to major creditors and vendors. Approximately $1.5 million dollars was placed in an escrow account for an anticipated payment to the New York Department of Corrections. Almost $8 million was placed

into an oversight account at PNC Bank. An Oversight Agreement between PHS and CPS created a committee that would take control of these funds and pay each of the two shareholders $500,000, pay outstanding obligations and creditors, and distribute any amounts remaining as directed by the shareholders of CPS. While PHS assumed certain enumerated liabilities under the Agreement, it specifically did not assume insurance-related liabilities for medical malpractice claims arising from CPS's administration of healthcare services prior to the closing date or any EEOC claims. Agreement, ¶3.3.

Almost six months after the execution of the Agreement, on September 18, 2000, Mr. Watson filed a medical malpractice action against CPS in the Court of Common Pleas of Montgomery County. He alleged that CPS had provided him with negligent medical care while he was an inmate at SCI-Graterford from 1989 to 1999. CPS did not file an answer and in February 2001, Appellant obtained a default judgment in the amount of $210,000 against CPS.[1] After Appellant garnished a CPS bank account in an attempt to satisfy his judgment, CPS filed a petition to strike and/or open

_____

[1] In his praecipe for judgment, Mr. Watson inserted the sum of $210,000 as damages, and certified therein that the "assessment of damages is for specified amounts alleged to be due in the complaint and is calculable as a sum certain from the complaint," a representation that cannot be confirmed by the record. **See** Defendant Corizon's Second Motion for Summary Judgment, 1/3/12, at Exhibit E.

the default judgment. In it, CPS represented that it had terminated operations and that PHS had purchased some of its contracts in 2000. The petition was not ruled upon.[2]

Seven years later, on April 24, 2008, Appellant commenced the within action against the Pennsylvania Department of Corrections and PHS alleging that both parties were liable for CPS's judgment based on the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa.C.S. §§ 5105-5110. In addition, he asserted liability against PHS based upon a theory of successor liability. The Department of Corrections filed preliminary objections that were sustained. PHS filed a motion for judgment on the pleadings premised on the statute of limitations under PUFTA and the contract provision that PHS was not assuming liability for medical negligence claims, which the trial court granted.

Mr. Watson appealed to this Court. On November 13, 2009, we affirmed the dismissal of the PUFTA claim as time barred, agreeing that Mr. Watson should have known about the sale of assets to PHS in 2001 when CPS moved to strike and/or open the judgment. **Watson v. Prison Health Servs.**, 988 A.2d 739 (Pa.Super. 2009) (unpublished memorandum) (**"Watson I"**). However, we reversed the grant of judgment on the

_____

[2] According to PHS, the court did not rule on the petition because CPS withdrew it. **See** Answer of Defendant Prison Health Services, Inc. to Plaintiff Eugene Watson's Amended Complaint, 7/28/08, at ¶14.

- 4 -

pleadings as to the successor liability claim, finding the pleadings insufficient to determine as a matter of law whether adequate consideration had been paid for the transfer.

Following remand, and before the trial court addressed the issue of consideration, PHS filed a motion for summary judgment. PHS argued that the successor liability action was barred by the statute of limitations. The trial court agreed and granted summary judgment. Mr. Watson appealed and this Court reversed, holding that Mr. Watson's "successor liability action against PHS to recover CPS's debt reduced to judgment is an equitable action" and that the trial court erred in applying the statute of limitations rather than the doctrine of laches. *Watson v. Prison Health*, 26 A.3d 1207 (Pa.Super. 2011) (unpublished memorandum at 15) ("*Watson II"*). We concluded further that Mr. Watson had not been duly diligent as he filed suit seven years after he was placed on reasonable notice that PHS purchased at least some of the assets. However, since laches would only bar the claim if PHS was prejudiced by the delay, we remanded for "the trial court to determine preliminarily, whether laches barred [Mr. Watson's] claim" and if not, to decide whether PHS paid adequate consideration for CPS's assets. *Id*. at 18.

On January 3, 2012, PHS filed the second motion for summary judgment that is the subject of this appeal. It contended that the successor liability claim was barred by laches, or, in the alternative, could not be

- 5 -

maintained because adequate consideration was paid for the asset purchase. After oral argument was heard on the motion, the trial court granted a motion by PHS to disregard what Mr. Watson submitted as an expert report: an unsigned report by an unidentified author with unknown credentials that was contained in his brief. On January 27, 2015, summary judgment was granted in favor of PHS. This appeal followed. Mr. Watson filed his Rule 1925(b) concise statement of errors complained of on appeal and the trial court issued its opinion.

Mr. Watson, appearing *pro se*, presents three issues for our review:

I.    Weather [sic] the trial court erred when it fail [sic] to prepare an opinion explaining is order, even though it waited over 2 ½ years to rule.

II.   Weathr [sic] the trail [sic] court erred in granting summary judgment to defendents [sic] when:

      a. they fail to present sufficient evidence to prove prejudice, and when

      b. Appellant submitted undisputed evidence that the consideration paid by defendents [sic] was inadequate.

III.  Weather [sic] the trial court erred when it fail [sic] to rule on motion that were still open before this court.

Appellant's brief at 3.

Mr. Watson's first assignment of error is that the trial court erred in failing to rule on the second motion for summary judgment for two and one-half years, and neglecting to issue an opinion at that time explaining the

reasons why it granted summary judgment. PHS does not address the issue.

Mr. Watson fails to develop his argument or cite to any authorities in support of his contention that a trial court's delay in ruling on the motion for summary judgment and failure to explain its reasoning is reversible error. Thus, the issue is waived. ***See*** Pa.R.A.P. 2119(a); ***see also Betz v. Erie Ins. Exch.***, 957 A.2d 1244, 1261 (Pa.Super. 2008) (deeming argument waived where litigant fails to cite pertinent authorities in support). However, even if we were not to find waiver, this claim lacks merit. The rules of civil procedure address one instance where a trial court is required to state its reasons for granting summary judgment on the record or in an opinion. Pa.R.C.P. 1035.3(e)(2) provides that, "A court granting a motion under subdivision (e)(1) shall state the reasons for its decision in a written opinion or on the record." Pa.R.C.P. 1035.3(e)(1) is limited to the situation where a court "rule[s] upon a motion for summary judgment without written responses or briefs" after the parties have been afforded a full and fair opportunity to supplement the record and oppose the motion.

Herein, the parties filed written responses, briefs, and the court heard argument on the motion. Thus, this was not a ruling pursuant to Pa.R.C.P. 1035.3(e)(1), and Pa.R.C.P. 1035.3(e)(2)'s requirement that the trial court state its reasons is inapplicable. Furthermore, the trial court thoroughly explained its reasoning in its Rule 1925(a) opinion. No relief is due.

Next, Mr. Watson contends that summary judgment was improper on his successor liability claim for two reasons. First, he maintains that there was insufficient evidence of prejudice to PHS to support a finding that laches barred the action. Second, Mr. Watson alleges that he submitted undisputed evidence that PHS paid inadequate consideration for the purchase of CPS's assets, which precluded entry of summary judgment.

In reviewing the propriety of the grant of summary judgment, we are governed by the following principles.

> [S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is de novo. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

**Summers v. Certainteed Corp.**, 997 A.2d 1152, 1159 (Pa. 2010) (internal quotations and citations omitted). A non-moving party who opposes summary judgment cannot rest on the pleadings but must produce evidence

- 8 -

demonstrating a genuine issue of material fact for trial. *DeWeese v. Anchor Hocking Consumer and Indus. Products Group*, 628 A.2d 421 (Pa.Super. 1993). Such evidence may include depositions, answers to interrogatories, admissions on file, expert reports and affidavits.

Laches is an equitable doctrine that bars relief when a complaining party fails to exercise due diligence to promptly institute an action and the other party is prejudiced thereby. *In re Estate of Warden*, 2 A.3d 565 (Pa.Super. 2010). As this Court noted in *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa.Super. 2014):

> The doctrine of laches is an equitable bar to the prosecution of stale claims and is "the practical application of the maxim that 'those who sleep on their rights must awaken to the consequence that they have disappeared.'" *Kern v. Kern*, 2005 PA Super 422, 892 A.2d 1, 9 (Pa. Super. 2005) (*quoting Jackson v. Thomson*, 203 Pa. 622, 53 A. 506, 506 (Pa. 1902)).

Laches involves a factual inquiry of the circumstances of a case. *In re Estate of Scharlach*, 809 A.2d 376 (Pa.Super. 2002). However, "[t]he question of whether laches applies is a question of law; thus, we are not bound by the trial court's decision on the issue." *Fulton*, *supra* at 131. In order to prevail on an assertion of laches, the burden is on the defendant to establish a delay arising from the plaintiff's failure to exercise due diligence, and that it was prejudiced due to the delay. *Commonwealth ex rel. Corbett v. Griffin*, 946 A.2d 668 (Pa. 2008). Prejudice exists where there is a changed condition of the parties during the period of, and in reliance

upon the delay, such as where records are lost or unavailable or witnesses die or cannot be located. **See Fulton**, **supra** (prejudice may be established by evidence that a witness has died or become unavailable, or that records were lost or destroyed, or that a defendant has changed his position due to a belief that the opposing party has waived his claims).

In Mr. Watson's first appeal, this Court confirmed that Mr. Watson was on notice of the sale of CPS assets to PHS in 2001 but waited seven years to commence the within action. **See Watson I**, **supra**. In his second appeal, we concluded that the seven-year delay constituted the lack of diligence required for a laches defense. However, recognizing that we have permitted suits in equity to proceed despite considerable delay where there has been no prejudice to the other party, and finding the record insufficiently developed to determine prejudice to PHS, we remanded to permit the trial court to make that determination. **Watson II**, **supra**.

PHS filed a second motion for summary judgment in which it argued that laches barred this action. In support of its position, PHS offered the affidavit of Scott King, Chief Legal Officer of PHS since 2005 and Secretary of the Board of Directors of its parent company, ASG. Defendant Corizon Health, Inc. f/k/a Prison Health Services, Inc.'s Second Motion for Summary Judgment, Exhibit B. Mr. King stated therein that employees of ASG who were particularly involved in negotiating the deal and supervising due diligence review were no longer employed by ASG. He later supplemented

that affidavit and averred that the witnesses are located outside of Pennsylvania. Mr. King averred that he personally confirmed that Michael Catalano, the former CEO of ASG, was unwilling to testify. Although he did not personally speak to Bruce Teal, the CFO of ASG and Executive Vice President and CFO of PHS at the time the Agreement was executed, Mr. King represented that he had personal knowledge that he would not testify on behalf of PHS.[3]

B. Warren Pope, Esquire, a partner of King and Spaulding in Atlanta, supplied an affidavit attesting to the fact that none of the firm's attorneys who represented PHS in the transaction were still with the firm. *Id*. at Exhibit H. At oral argument on the motion, counsel for PHS represented that the unavailability of these key witnesses hindered its ability to defend itself as documents could not tell the whole story.

Mr. Watson counters first that PHS was not prejudiced due to his lack of diligence as it did not detrimentally change its position due to the delay. *See In re Estate of Aiello*, 993 A.2d 283, 287 (Pa.Super. 2010) (defining prejudice in this context as a change in position to its detriment due to the

_____

[3] Counsel for PHS represented at oral argument on June 1, 2012, that Regis Dorch, the Executive Vice-President of Operations for ASG died in 2007, but admitted that this fact was not of record. Counsel offered to file a supplementary affidavit confirming that fact, N.T., 6/1/12, at 15, and the trial court directed counsel to submit an affidavit. *Id*. at 49. In our review of the certified record, we did not find an affidavit to that effect.

delay). He maintains that the fact that witnesses are no longer employed and live out of state is insufficient to substantiate a claim of unavailability. Furthermore, Mr. Watson contends that there is extensive documentation available in ***Prison Health Servs. v. Umar***, 2002 U.S.Dist.LEXIS 1228 (E.D. Pa. 2002), a proceeding filed by PHS against Emre Umar for breach of his agreement not to compete, that is sufficient to fill any gaps in that regard.

The trial court did not definitively rule on the laches defense. Rather, it merely noted that the equities did not warrant drawing in ASG's key former employees, some retired or disgruntled, who were reluctant to become involved in what it concluded was non-viable successor liability litigation.

It appears that although the corporate officers who were involved in the sale are no longer employed, their whereabouts are known to PHS and ASG. PHS concedes that these witnesses are subject to subpoena and deposition by letters rogatory. While the latter process is more arduous than merely directing one's corporate officers to provide testimony at trial or by deposition, the witnesses are available. Furthermore, Mr. King's May 25, 2012 affidavit only establishes that Mr. Catalano stated that he is unwilling to testify on behalf of PHS, not that he would not testify if compelled. Mr. King's representation that Mr. Teal would be unwilling is based on supposition as he admittedly did not contact him. ***See*** Pa.R.C.P 1035.4

("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the signer is competent to testify to the matters stated therein."). In short, PHS did not sufficiently demonstrate that these witnesses were truly unavailable to establish prejudice for the laches defense.

We turn now to Mr. Watson's claim that summary judgment was improperly granted on the merits of his successor liability claim. He claims that he proffered sufficient evidence that PHS purchased CPS for inadequate consideration and without provision for payment of employee discrimination and medical malpractice claims so as to create a genuine issue of material fact that would preclude the entry of summary judgment.

The general rule in Pennsylvania is that "when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property." *Continental Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005). Pennsylvania courts have identified five exceptions to this general rule against successor liability where: (1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to

escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation. *Id*. *Johnson v. Am. Std.*, 8 A.3d 318, n.1 (Pa. 2010). As this Court observed in our prior memorandum, "The last four exceptions are related to the concept that a corporate entity seeking to escape liabilities cannot simply sell its assets to another corporate body to evade its responsibilities." *Watson II*, *supra* at 13. The second and third exceptions are implicated where there is a continuity of identity between the buyer and seller, which is not the case herein. The fifth exception is the focus of this appeal: whether there was adequate consideration for the transfer and whether provisions were made for creditors of the selling corporation.

The burden of proving that the transfer was made without adequate consideration and without provision for the seller's creditors is on Mr. Watson herein. Mr. Watson contends first that the asset purchase agreement did not provide for creditors. In support thereof, he asks this Court to take judicial notice of facts he gleaned from filings in *Prison Health Servs. v. Umar*, *supra*[4] and *Brzozowski v. Corr. Physician*

_____

[4] PHS obtained injunctive relief therein against Emre Umar and Correctional Medical Care, Inc., for their violation of the noncompetition agreement that was part of the Asset Purchase Agreement. While it was noted therein that CPS was in financial difficulty when it sold its assets, it was also acknowledged that several other entities were competing with PHS to purchase CPS's assets.

*Servs.*, 360 F.3d 173 (3d Cir. 2004). He maintains that, although the asset purchase agreement provided for the payment of secured creditors, vendors, the escrow of more than $1 million for an anticipated payment to the New York Department of Corrections, and $4 million for other creditors, no provision was made to pay any amounts that could be awarded on an EEOC claim filed by Ms. Brzozowski or his threatened but unfiled malpractice claim.[5] Furthermore, since the transaction was structured to place the Umars and secured creditor First Union at the head of the line, "it is reasonable to infer that PHS engaged in this sale so that CPS could avoid its liabilities." Appellant's Brief at 17.[6]

In response, PHS points to its due diligence to discover all known or threatened litigation against CPS, its debts, and the creation of an oversight committee and account to ensure the payment of creditors. It argues that

_____

[5] Ms. Brzozowski's employment discrimination claim, unlike Mr. Watson's unfiled medical malpractice claim, was specifically referenced in the Agreement between PHS and CPS. The Court of Appeals pointed to that fact when it permitted her to amend her complaint to assert a successor liability claim against PHS in an attempt to collect the consent judgment entered against CPS on her claim. The Court reasoned that PHS "had means at its disposal to anticipate such a situation and offset expected costs associated with a potential claim like that of [Ms. Brzozowski]." *Brzozowski v. Corr. Physician Servs.*, 360 F.3d 173, 178 (3d Cir. 2004).

[6] In support thereof, Mr. Watson supplied an anonymous unsigned expert report that was disregarded by the trial court. He notes in passing that Pa.R.C.P. 1035.1 contains no requirement that a report be signed, but does not challenge the court's ruling on appeal.

this conduct distinguishes the instant situation from the one identified in *Johnson*, *supra*, where "no provisions were made for creditors of the selling corporation." Appellee's brief at 20. According to PHS, the law does not require a buyer to provide for payment to all unknown or potential creditors. It charges that Mr. Watson had not filed a lawsuit at the time the Agreement was executed and thus, he was not identified on Schedule 4.1.12 (Material Litigation). PHS takes issue with Mr. Watson's characterization of himself as a creditor since he had not filed a claim prior to the execution of the Agreement.[7]

Herein, the record confirms that PHS took steps to ensure that creditors were not shortchanged in the transfer. It assumed the liabilities identified in Schedule 6.2.2. It required CPS to disclose its creditors, created an oversight fund from which payment would be made to vendors and creditors like Ms. Brzozowski, and formed an oversight committee to administer and distribute the funds. Unlike Ms. Brzozowski, Mr. Watson had not filed a claim as of the date of the Agreement and was not identified as a creditor in the Agreement. Mr. Watson's claim is that the Agreement should have made provision for the payment of persons who asserted medical malpractice claims after its execution. We believe it did. PHS ascertained

_____

[7] Ms. Brzozowski is listed on Schedule 4.1.12 as having asserted a claim with the HRC prior to the execution of the Agreement. However, she had not yet obtained a judgment.

- 16 -

through its due diligence that there was an occurrence-based professional liability policy in effect that would cover medical negligence claims such as the one subsequently filed by Mr. Watson. This simply does not present a situation where no provisions were made for creditors of the selling corporation.

Mr. Watson also contends that the consideration PHS paid for CPS's assets was inadequate. While he proffered what he titled an expert report in support of his position, the trial court disregarded the report as its author was unidentified and the report was unsigned. Mr. Watson does not challenge that ruling on appeal. Thus, he failed to offer any expert opinion that the consideration paid was inadequate. His argument is based solely upon another unrelated transaction where a higher multiplier was used to calculate the value of assets and yielded a higher value. He contends that the multiplier used herein was too low and resulted in a correspondingly low valuation.

PHS counters that it performed due diligence for a year prior to the execution of the asset purchase agreement, hired independent professionals to conduct arms-length valuation analyses, and paid a purchase price within the range of value determined by those professionals. The reports of Morgan Keegan and Ernst and Young were appended to PHS's motion. Those reports substantiate that the amount paid was adequate. PHS

maintains that it cannot be required to pay more than the assets were worth as that would undermine the business judgment rule.

Additionally, PHS cites its disclosure to and approval from the Security and Exchange Commission, the New York State Attorney General, and the Pennsylvania Department of Corrections, as further evidence that the Agreement was not constructively fraudulent. It argues that Mr. Watson failed to offer evidence sufficient to create a genuine issue of material fact as to whether the consideration paid by PHS was adequate.

We agree. PHS performed its due diligence for a year prior to the asset purchase. As part of that process, Ernst and Young performed an independent analysis of CPS's financial data. PHS also hired Morgan Keegan and relied upon its fairness opinion. The trial court expressly found that the Morgan Keegan valuation "represents an expert opinion of value which this Court considers key to the defense of the successor liability based on the asset purchase." Trial Court Opinion, 6/23/15, at unnumbered 6. Mr. Watson did not supply a contrary expert opinion as to CPS's value or the adequacy of the consideration paid. It is not enough for Mr. Watson to point to another transaction where a higher multiplier was used in computing value and to ask this Court to infer that the same multiplier should have been used herein to yield a higher value. That is the role of an expert. In short, we agree with the trial court that Mr. Watson "failed to supply any

evidence which, if believed, could support a successor liability claim." *Id*. at unnumbered 8. On the record before us, summary judgment was proper.

Finally, Mr. Watson complains summary judgment was inappropriate as there were outstanding discovery motions. He maintains that his motion to compel PHS to provide discovery had not been addressed when summary judgment was granted although he filed a praecipe for argument. PHS acknowledges that such a motion had been filed. However, PHS represents that the parties conferred on the discovery issues and PHS provided answers to Mr. Watson's interrogatories and requests for production of documents. Thus, PHS contends the motion is moot.

In opposing summary judgment, Mr. Watson did not argue that summary judgment was premature due to outstanding discovery issues. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Furthermore, in his Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, Mr. Watson vaguely alleged that the trial court erred when it failed "to rule on motion that where [sic] still open." Pa.R.A.P. 1925(b) Concise Statement, 3/25/15, at 1. The trial court did not address this issue in its Rule 1925(a) opinion, an omission we attribute to Mr. Watson's failure to supply sufficient detail to apprise the court of his complaint. We find this issue waived for this additional reason.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/4/2016</u>