4 A.3d 610

**BOARD OF REVISION OF TAXES, CITY OF PHILADELPHIA, and Charlesretta Meade; Robert N.C. Nix, III; Russell M. Nigro; Alan K. Silberstein; Howard M. Goldsmith; and Anthony Lewis, Jr., In their Official Capacities as Members and Officials of the Board of Revision of Taxes, and as individuals in their Own Right, Petitioners**

v.

**CITY OF PHILADELPHIA, Respondent**

Supreme Court of Pennsylvania.

Submitted Sept. 20, 2010.

Decided Sept. 20, 2010.

108

110

William P. Murphy, Howard Kenneth Goldstein, Philadelphia, for Board of Revision of Taxes City of Philadelphia.

Richard Feder, Craig R. Gottlieb, City of Philadelphia Law Department, for City of Philadelphia.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

Petitioners, the City of Philadelphia's Board of Revision of Taxes ("the BRT") and Charlesretta Meade, Robert N.C. Nix, III, Russell M. Nigro, Alan K. Silberstein, Howard M. Goldsmith, and Anthony Lewis, Jr., individually and in their official capacities as BRT members, filed in this Court an application for leave to file original process, which we grant, and an application for the "Exercise of Original Jurisdiction and King's Bench Power" over this lawsuit against respondent, the City of Philadelphia ("City").[1] Petitioners ask that we exercise jurisdiction and then grant: (1) preliminary and permanent injunctions, and/or writs of mandamus, prohibition, and *quo warranto* to halt the implementation of a City ordinance dated December 17, 2009, which abolishes the BRT effective on October 1, 2010 ("Reorganization Ordinance"); (2) a permanent injunction, equitable relief, and writs of mandamus and prohibition to halt the continued operation of a City ordinance dated April 22, 2010, which reduced the salaries and benefits of BRT members ("Salary Ordinance"); or, alternatively, (3) an order requiring immediate consideration by a lower court of its injunction and writ requests regarding the Reorganization and Salary Ordinances.[2]

Philadelphia's BRT was created by statute in June 1939.[3] Pursuant to law, for the next seventy years, the BRT's seven

---

1. Petitioners explain that their application for "Exercise of Original Jurisdiction" is actually a request pursuant to 42 Pa.C.S. § 726 ("Extraordinary Jurisdiction"). Petitioners' Application, at ¶ 9.

2. The Reorganization and Salary Ordinances are attached to this Opinion as Appendix A.

3. P.L. 1199, § 1 *et seq.* of June 27, 1939, codified at 72 P.S. §§ 5341.1–5341.21.

members were appointed for terms of six years by a majority of the judges serving on the Philadelphia County Court of Common Pleas. *See* 72 P.S. §§ 5341.1, 5341.2. The BRT assesses the value of real property in Philadelphia, examines tax returns, and hears appeals from assessments. *See* 72 P.S. §§ 5341.7, 5341.8, 5341.11, 5341.14. In December 2009, the Philadelphia City Council adopted (and Mayor Michael A. Nutter signed) the Reorganization Ordinance, which aimed to abolish the BRT and replace it with two newly-created bodies, whose members would be appointed by the mayor with the consent of City Council. The BRT's functions would be divided between the new entities: the Office of Property Assessment, which would make initial and revised property assessments, and the Board of Property Assessment Appeals ("Board of Appeals"), which would hear appeals from assessments. By its terms, the Reorganization Ordinance would come into effect on October 1, 2010, but only if ratified by the electorate at the May 2010 primary election, as required by 53 P.S. § 13132(d).

In March 2010, the BRT filed an application with this Court seeking exercise of our King's Bench power, and requesting that we enjoin submission to the electorate and placement on the ballot at the May 2010 primary election of a question intended to ratify the Reorganization Ordinance. On April 27, 2010, this Court denied BRT's application in a *per curiam* order. *Board of Revision of Taxes v. City of Philadelphia,* 993 A.2d 873 (Pa.2010). Subsequently, at the May 2010 primary election, the Philadelphia electorate approved the City's Reorganization Ordinance, and ripened the controversy.

In the meantime, City Council adopted (and Mayor Nutter signed) the Salary Ordinance, which: reduced the annual salaries of the BRT chair and secretary from $75,000 and $72,000 to $50,000 and $45,000, respectively; and eliminated annual salaries of $70,000 for the remaining BRT members and substituted *per diem* compensation of $150, tied to the members' actual attendance at hearings or meetings in furtherance of their duties. The Salary Ordinance became effec-

tive immediately after being signed by the Mayor, on April 22, 2010.

On June 15, 2010, the BRT and its members, individually and in their official capacities, filed a petition for review in the original jurisdiction of the Commonwealth Court seeking to enjoin the Reorganization Ordinance, and requesting writs of prohibition, mandamus, and *quo warranto,* and other equitable relief. Furthermore, the BRT and its members asked for similar relief with regard to the Salary Ordinance, which had already reduced BRT members' salaries. After a hearing, on July 16, 2010, the Commonwealth Court dismissed BRT's petition for lack of jurisdiction. In an unpublished memorandum opinion, the court held that the BRT is a local—not a Commonwealth—agency and, therefore, the BRT and its members could not invoke the Commonwealth Court's original jurisdiction under 42 Pa.C.S. § 761(a)(2).[4] The Commonwealth Court transferred the matter to the Philadelphia County Court of Common Pleas.

The BRT and its members did not appeal the Commonwealth Court's transfer order. Instead, on July 26, 2010, the same petitioners filed with this Court the instant applications, in which they ask that we exercise our original jurisdiction or King's Bench power to grant them various forms of relief. For the reasons that follow, we exercise plenary jurisdiction over petitioners' challenge under 42 Pa.C.S. § 726, but only as to the Reorganization Ordinance, and we consider the case under submission on the existing pleadings.[5] We enjoin the Reorganization Ordinance in part, insofar as it affects the BRT's appellate function. We hold that the remaining provisions of the Reorganization Ordinance, which we find are severable, are valid. We also hold that the BRT and its

4. Section 761(a)(2) provides in relevant part: "The Commonwealth Court shall have original jurisdiction of all civil actions or proceedings ... [by] the Commonwealth government, including any officer thereof, acting in his official capacity, except eminent domain proceedings." 42 Pa.C.S. § 761(a)(2).

5. In light of our determination to exercise jurisdiction over the Reorganization Ordinance and decide that controversy now, petitioners' alternative request that we direct prompt consideration below is moot.

members must be stricken as petitioners to the extent they have sued in their official capacities. Finally, we dismiss petitioners' request to exercise extraordinary jurisdiction or King's Bench powers to review the Salary Ordinance, and will allow that challenge to proceed below in the ordinary course.

## I. *The Reorganization Ordinance*

Petitioners request that we assume plenary jurisdiction over the action pending in the Philadelphia County Court of Common Pleas and address the validity of the Reorganization Ordinance. Petitioners claim that the Reorganization Ordinance is invalid, particularly to the extent that the City transferred the BRT's appellate function to a body appointed by the Mayor and dissolved the BRT in its entirety. According to petitioners, the City's action has immediate public importance because it "subject[s] the public to the jeopardy of voiding all appeals to [the] replacement Board" and, in the future, would expose the public to "multiple appeals, delay and expense once the [BRT] is restored to its rightful role free from the *ultra vires* interference of the City." Petitioners further argue that, unless we act, the new appellate entity will be tainted by legal infirmities, "thereby engendering public confusion and uncertainty, . . . denying the due process of law to which the public is entitled, and ultimately eroding the public's confidence in the processes of government." Petitioners insist that "the general public's great interest in mandating the obedience of the City to the supreme statutory and Constitutional law of the Commonwealth" should compel this Court to act now.

On the merits, petitioners claim that the City's action to abolish the BRT's appellate function in favor of creating the Board of Appeals was *ultra vires* and void. The crux of petitioners' argument is that the BRT's authority to entertain assessment appeals is recognized in the governing Pennsylvania legislation as a quasi-judicial function separate from the BRT's administrative or ministerial function of assessing the value of real property in Philadelphia. Citing 53 P.S.

§ 13132,[6] petitioners contend that the General Assembly delegated to the City the power to reorganize, abolish, or transfer the BRT's ministerial function of assessing property values but not its authority to review appeals from those assessments. Section 13132(c) addresses the City's power to "abolish" as follows:

> Subject to the provisions of the Philadelphia Home Rule Charter and the First Class City Home Rule Act ... the Council of the City of Philadelphia shall have full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of the Sheriff, City Commissioners, Registration Commission and **Board of Revision of Taxes or its successor, with respect to the making of assessments of real and personal property as provided by act of Assembly.**

53 P.S. § 13132(c) (emphasis added). *See* 72 P.S. §§ 5341.7–5341.8 (describing BRT's duty to supervise property value assessments made by assessors); §§ 5341.14–5341.14a (describing BRT's appellate function).

According to petitioners, the City's power under this provision is limited to reassigning the BRT's administrative function of making assessments, with the remaining function intentionally preserved by the General Assembly. *See* 53 P.S. § 13132(c); PA. CONST. Art. XV, § 1–5 (repealed; now at PA. CONST. Art. IX, § 2) (home rule and limits on local government). Petitioners observe that Section 13132(c) was adopted by the General Assembly in 1963 to complete the integration of former county offices and departments into City government following the consolidation of Philadelphia City and County offices, which began in 1951, and was intended to delineate the outer limits of the City's power with respect to offices, boards, and commissions previously associated with county government. *See* PA. CONST. Art. XIV, § 8 (repealed and reenacted at PA. CONST. Art. IX, § 13) (abolition of county offices in Philadelphia). Petitioners also rely on *Truscott v.*

---

**6.** P.L. 1476, § 2 of Aug. 26, 1953, as amended by P.L. 795, § 1 of Aug. 13, 1963, codified at 53 P.S. § 13132(a)-(d).

*City of Philadelphia,* 380 Pa. 367, 111 A.2d 136 (1955), to support their position.

*Truscott* involved a prior attempt by the City to abolish the BRT. This Court invalidated that effort based on a statutory provision which did not specifically address the BRT. The relevant provision—now codified at 53 P.S. § 13132(a)—vested in City Council the power to abolish "the Coroner, Recorder of Deeds, City Treasurer, Clerk of the Court of Quarter Sessions, Oyer and Terminer and General Jail Delivery and the Board of Inspectors of the Philadelphia County Prison." The City viewed this list as non-exclusive and passed an ordinance in August 1954 purporting to abolish the BRT. The Commonwealth, through the Attorney General, filed a complaint in equity in this Court to enjoin the ordinance as a usurpation of the General Assembly's power, and this Court held that the City's ordinance indeed was unconstitutional and void. 111 A.2d at 141. Similar to the Commonwealth in *Truscott,* petitioners argue here that, in plain language, the City has no power under Section 13132(c) to abolish the BRT completely or to reassign its appellate function. Petitioners claim that the City's action to that effect was *ultra vires* and, therefore, the Reorganization Ordinance is void in that respect. Petitioners further assert that the legislative history of Section 13132(c), including floor debate between the proponent of a BRT-specific amendment to the provision and an opponent of the amendment, fully supports this position.

Finally, according to petitioners, the City's action is not a mere violation of governing legislation but also usurps the statutory power of the Judiciary to make appointments to the BRT. Pursuant to 72 P.S. § 5341.2, "all appointments of members of the [BRT] shall be made by a majority of the judges of the courts of common pleas of [Philadelphia C]ounty." The Reorganization Ordinance eliminates the appointment power of the Judiciary and transfers that power to the City's executive branch. *See* Reorganization Ordinance § 2–302(3).[7] In addition, the Ordinance voids the judicial six-year

7. Pursuant to the Reorganization Ordinance, the Board of Appeals would have seven members all appointed by the Mayor, with the advice

appointments of the present BRT members. Petitioners argue that both actions infringe on the power of the Judiciary and impugn its legislatively-ordained role, in this instance, as a co-equal branch. Furthermore, petitioners claim that the General Assembly expressed its clear intent that judicial involvement in the appointment of BRT members was warranted. According to petitioners, the transfer of the appointment power is a departure from that express intent and undermines the "element of independence" which the Legislature sought to ensure respecting the BRT's appellate role by providing for judicial, rather than political, appointment of its members.

Petitioners allege that they have a clear right to relief, that no adequate remedy at law for damages is available, and that they and the public will suffer irreparable harm if this Court does not exercise jurisdiction and enjoin the Reorganization Ordinance before it takes effect. In the alternative, petitioners seek a writ of *quo warranto* challenging "the false claim of title and right for the replacement entity" and its members, a writ of prohibition barring the City from effectuating the Reorganization Ordinance, and a writ of mandamus compelling the City to comply with Section 13132(c).

In response, the City concurs in petitioners' request that this Court exercise jurisdiction over the challenge to the validity of the Reorganization Ordinance. The City agrees with petitioners that the matter presents an issue of immediate public importance in Philadelphia and that "there would be great public advantage to an early and final resolution of this dispute." According to the City, an accelerated decision on the merits will dispel any "uncertainty in the minds of the

and consent of a majority of City Council members, from among the nominees recommended to the Mayor by the Board of Property Assessment Appeals Nominating Panel ("Panel"). The Panel is also a newly-minted entity whose seven members are appointed, one each, by the Mayor, the City Council President, the Philadelphia Bar Association, the Building Industry Association of Philadelphia, the Housing Association of Delaware Valley, the Greater Philadelphia Association of Realtors, and the Southeast Chapter of the Assessors' Association of Pennsylvania. *See* Reorganization Ordinance §§ 2–301(1), 2–302(3). Under this scheme, the common pleas judges play no role.

public (whose properties will be subject to assessment by the new agencies) and in the minds of the City officials exercising that assessment authority."

Next, the City raises several preliminary objections to petitioners' application. The first objection amounts to a procedural matter. The City asserts that the BRT and its members acting in their official capacities must be stricken as parties to this lawsuit because, as a city agency and city officials, they are prohibited (1) from filing a legal action with private representation, pursuant to the Philadelphia Home Rule Charter, 351 Pa.Code §§ 4.4–400 and 8.8–410, and/or (2) from filing a legal action without adequate ratification under the Sunshine Act, 65 Pa.C.S. § 708. According to the City, the only proper parties to the action are the members of the BRT in their individual capacities.

The second objection is in the nature of a demurrer. The City argues that the General Assembly authorized Philadelphia's City Council to abolish the BRT completely, without any reservation of authority over the BRT's "appellate function." The City claims that the reference in Section 13132(c) to the "making of assessments" is a description of the BRT's entire role, from its initial valuation process to its appellate review of assessments. In support of this argument, the City finds evidence in 72 P.S. § 5020–518.1 that the General Assembly uses the term "assessments" as a generic term for the entire administrative process, including the appeal function of the BRT. *See* 72 P.S. § 5020–518.1 (provision titled "Appeal to court from assessments" allows property owner to appeal BRT's appellate decision to court of common pleas). The City also adverts to other legislation and court decisions that likewise utilize the term "assessment" to mean both the initial valuation stage and the appellate stage of the BRT's function. *See, e.g.,* 72 P.S. § 5341.14 (describing procedure for administrative appeal to BRT); 53 P.S. § 13133(a)(9) (city shall not enlarge or limit powers granted by acts of General Assembly that provide "for the assessment of real or personal property and persons for taxation purposes"); *Appeals of Mathies Coal Co.,* 435 Pa. 129, 255 A.2d 906 (1969) (referring to BRT's

appellate decision as "a tax-assessment"); *Appeal of Rieck Ice Cream Co.*, 417 Pa. 249, 209 A.2d 383 (1965) (same). Indeed, the City argues, when a court wishes to distinguish between an initial assessment and the BRT's final assessment after administrative appeal, it refers to the two stages in those terms, recognizing that "assessment" refers to the entire process. *See, e.g., Deitch Co. v. Bd. of Prop. Assessment*, 417 Pa. 213, 209 A.2d 397 (1965). As a final argument, the City postulates that, given its power to abolish the BRT, it would be "an odd choice" if the City were only authorized to "abolish" the BRT in part.

The City also responds to petitioners' claim that the General Assembly deliberately intended to preserve the appellate function of the BRT because of its kinship with the judicial process. According to the City, the BRT's appellate role "is not particularly judicial in nature" given that its factual findings are subject to review *de novo* by the court of common pleas. Further, the City argues that judicial appointment of BRT's members is not a prerequisite to preserving any quasi-judicial nature of the BRT, given that other boards, like zoning boards for example, are appointed by local city councils. According to the City, petitioners have not demonstrated "any particularly important" non-textual reason "to preserve the court appointment aspect of the BRT's appellate function, while simultaneously allowing the elimination of the court appointment function of the BRT's initial valuation function."

Moreover, the City claims, the views of individual lawmakers involved in legislative floor debate cannot trump the actual statutory language finally voted upon and approved by the General Assembly in Section 13132(c). *See, e.g., McCormick v. Columbus Conveyer Co.*, 522 Pa. 520, 564 A.2d 907, 910 n. 1 (1989) ("what is said in debate, the remarks and understanding of individual legislators, is not relevant in ascertaining the meaning of a statute"). The City argues that "there is no way to know how many members of the General Assembly even were present to hear the views of the few vocal members" who referred to separate assessment and appeal functions of the BRT. According to the City, the plain language of Section

13132(c), as well as "logic," weighs in favor of finding the Reorganization Ordinance a valid exercise of City Council's authority to abolish the BRT.

In the alternative, if we find that City Council was not authorized to abolish the entire BRT, the City requests that we sever the offending portions of the Reorganization Ordinance and allow the unchallenged balance of the ordinance, governing the making of initial and revised assessments, to stand.

## A. *Jurisdiction*

The threshold question is whether this Court should exercise jurisdiction to review petitioners' challenge to the validity of the Reorganization Ordinance presently, or allow it to travel in its ordinary course of litigation. This Court may assume, at its discretion, plenary jurisdiction over a matter of immediate public importance that is pending before another court of this Commonwealth. *See* 42 Pa.C.S. § 726. Although employed to similar effect, our extraordinary jurisdiction is distinct from our King's Bench jurisdiction, which allows us to exercise power of general superintendency over inferior tribunals even when no matter is pending before a lower court. *In re Dauphin County Fourth Investigating Grand Jury*, 596 Pa. 378, 943 A.2d 929 (2007). Where, as here, an action between the same parties regarding the same issue is pending in the Philadelphia County Court of Common Pleas, the appropriate request is for the exercise of extraordinary jurisdiction and we will treat petitioners' application as such. *Id.* at 933 n. 3.

In exercising our discretion regarding whether to assume plenary jurisdiction, this Court considers the immediacy and public importance of the issues raised. *See* 42 Pa.C.S. § 726. Plenary jurisdiction is invoked sparingly and only in circumstances where the record clearly demonstrates the petitioners' rights. *Commonwealth v. Morris*, 565 Pa. 1, 771 A.2d 721, 731 (2001); *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425, 430 n. 11 (1978). However, "[e]ven a clear showing that a petitioner is aggrieved does not assure

122

that this Court will exercise its discretion to grant the requested relief." 387 A.2d at 430 n. 11.

■ We agree with the BRT and the City that this case warrants assumption of plenary jurisdiction over the challenge to the Reorganization Ordinance. This is not a garden variety dispute, but a case having its genesis in the City's decision to revamp the existing agency performing property assessments. It is of interest not only to the BRT's members, who face elimination of their roles, but also to the City, to all City property tax payers, and to the Judiciary, whose appointment power is alleged to have been eliminated. It is in the public's interest that a prompt and final determination be rendered on the issue of whether the BRT (or the new Board of Appeals) will perform the BRT's current appellate function so as to maintain continuity and a working system of local taxation and revenue collection in the City. A clear final ruling before the Reorganization Ordinance would come into effect in October 2010 will insulate the decisions of the local agency performing the appeal function from collateral attack and provide a surer prospect of finality to parties in appeals from assessments. Swift resolution of this matter will also promote confidence in the authority and integrity of our state and local institutions. *See generally Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918 (2006) (Court assumed plenary jurisdiction over constitutional challenge to legislation that tied salaries of state officials to those of federal officials); *Perzel v. Cortes,* 582 Pa. 103, 870 A.2d 759 (Pa.2005) (Court assumed plenary jurisdiction to review rejection by Commonwealth's Secretary of election writ issued by House Speaker; rejection was an act unsupported by constitutional or statutory authority); *Ieropoli v. AC & S Corp.,* 577 Pa. 138, 842 A.2d 919 (2004) (Court assumed plenary jurisdiction over challenge to constitutionality of statute which extinguished appellants' causes of action that had accrued before statute was enacted); *Silver v. Downs,* 493 Pa. 50, 425 A.2d 359, 362 (1981) (Court assumed plenary jurisdiction over interlocutory appeal from order disqualifying township solicitor from representing township officers). That the validity of the Reorganization Ordinance is of immediate pub-

lic concern is, therefore, beyond contest. Further, there is no factual dispute; the issue is one of law, resolvable on the pleadings. And, finally, as discussed in detail infra, the record demonstrates that petitioners have a clear right to relief. Consequently, our exercise of plenary jurisdiction here is proper.

### B. *Authority to Bring Suit*

We turn next to the City's claim that the BRT and BRT members acting in their official capacities have no authority at law to bring this action. Petitioners do not dispute the claim. We agree. Pursuant to Philadelphia's Home Rule Charter, the BRT and its members—as a City agency and its officers— must receive approval from the City Solicitor to proceed in this action with private representation. Section 8–410 of the Charter provides that it "**shall be unlawful** for any officer, department, board or commission to engage any attorney to represent him or it in any matter or thing relating to his or its public business without the approval in writing of the City Solicitor." 351 Pa.Code § 8.8–410 (emphasis added); *Lennox v. Clark*, 372 Pa. 355, 93 A.2d 834 (1953) (BRT member is City officer and, pursuant to Home Rule Charter, may not engage private attorney to represent him in matter related to public business without approval of City Solicitor). *See Silver v. Dilworth*, 403 Pa. 645, 170 A.2d 575 (1961) (Home Rule Charter did not preclude Mayor's appointment of special counsel where Mayor received approval from City Solicitor). Further, the City Solicitor has a duty by law to represent "the City and every officer, department, board or commission in all litigation." *See* 351 Pa.Code § 4.4–400(b). As this Court has recognized, the "requirement that all the [C]ity departments should rely upon the City Solicitor for advice is obviously a wise one, since it is important that there be a unified, consistent interpretation of legal situations arising under the administration of the city government, which might not be the case if there were individual solicitors for the different departments." *Lennox*, 93 A.2d at 840 (footnote omitted).

■ Here, petitioners admitted in earlier litigation that they requested permission from the City Solicitor to hire private counsel in this matter, but that the request was denied. *See BRT's Answer to Motion to Strike,* 32 EM 2010, at 6–7. Their action here clearly does not have the "approval in writing of the City Solicitor" required by Section 8–410 of the Home Rule Charter. We therefore hold that the BRT and BRT members acting in their official capacities must be stricken as petitioners in this action. The only petitioners remaining in this suit are the BRT members acting in their individual capacities. As noted previously, the City does not challenge the BRT members' right to proceed individually in this action, and so this determination does not impede our power to proceed to the merits.[8]

C. *Abolition of the BRT and Reassignment of the BRT's Appellate Function to the Newly–Formed Board of Appeals*

We now consider the merits of the individual petitioners' claim that the Reorganization Ordinance was *ultra vires* and invalid. Essentially, we must determine whether the General Assembly authorized the City to abolish the BRT's appellate, or adjudicative, function. This is a question of statutory interpretation, decided as a matter of law on the existing pleadings. *Commonwealth v. Janssen Pharmaceutica, Inc.,* 2 A.3d 474 (Pa.2010); *Kilmer v. Elexco Land Servs., Inc.,* 990 A.2d 1147, 1151, 1158 (Pa.2010).

■ "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a); *Commonwealth v. McCoy,* 599 Pa. 599, 962 A.2d 1160, 1167–68 (2009). A statute's plain language generally provides the best indication of legislative intent. *McCoy,* 962 A.2d at 1166;

8. The City also objects to suit by petitioners in their official capacities on the ground that the action was not properly authorized at an open public meeting, pursuant to the Sunshine Act, 65 Pa.C.S. § 708. We need not reach this additional argument.

*Ephrata Area Sch. Dist. v. County of Lancaster,* 595 Pa. 111, 938 A.2d 264, 271 (2007); *Pennsylvania Fin. Responsibility Assigned Claims Plan v. English,* 541 Pa. 424, 664 A.2d 84, 87 (1995) ("Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words."). Only where the words of a statute are not explicit will we resort to other considerations to discern legislative intent. *Ephrata Area Sch. Dist., supra;* see also 1 Pa.C.S. § 1921(c); *In re Canvass of Absentee Ballots of Nov. 4, 2003 Gen. Election,* 577 Pa. 231, 843 A.2d 1223, 1230 (2004). Moreover, in this analysis, "[w]e are not permitted to ignore the language of a statute, nor may we deem any language to be superfluous." *McCoy,* 962 A.2d at 1168. Governing presumptions are that the General Assembly intended the entire statute at issue to be effective and certain, and that the General Assembly does not intend an absurd result or one that is impossible of execution. *See* 1 Pa.C.S. § 1922(1)-(2).

 We are also mindful that statutes which relate to the same persons or things must be construed together as one statute. *See* 1 Pa.C.S. § 1932. "[S]ections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." *Housing Auth. of County of Chester v. Pa. State Civil Serv. Comm'n,* 556 Pa. 621, 730 A.2d 935, 945 (1999). A word or phrase whose meaning is clear when used in one section of a statute will be construed to mean the same thing in another section of the same statute. *Id.* at 946.

 As stated, the relevant statutory language provides: Council of the City of Philadelphia shall have full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of the Sheriff, City Commissioners, Registration Commission and Board of Revision of Taxes or its successor, with respect to the making of assessments of real and personal property as provided by act of Assembly. 53 P.S. § 13132(c). Petitioners concede that subsection (c) permits the City to reassign to another entity (in this case, the

Office of Property Assessment) the BRT's ministerial function to make initial property assessments and revise them, but challenge the authority of the City, pursuant to the same subsection, to abolish and reassign the BRT's appellate function to the newly-created Board of Appeals, and to eliminate the BRT entirely as a result. The City responds that it has authority pursuant to subsection (c) to reassign all of the BRT's present tasks to the newly-created entities and to abolish the BRT in its entirety. The City's view is based on the proposition that the term "making of assessments," as used in Section 13132(c), includes both the BRT's ministerial and adjudicative duties. After review, we conclude that the City's interpretation is not supported by the plain language of the statute and we find that the Reorganization Ordinance is invalid in part. Pursuant to the plain language of Section 13132(c), Philadelphia City Council has unqualified authority over the local offices of Sheriff, City Commissioner, and Registration Commission, including the power to abolish them. In contrast, the General Assembly singles out one entity, the BRT, and qualifies the delegation of power to City Council. The power conveyed is only "with respect to the making of assessments of real and personal property as provided by act of Assembly." Petitioners' interpretation reflects this significant, but curtailed, grant of power and gives effect to the actual language of the entire provision. By comparison, the City's interpretation and construction of Section 13132(c) is that the qualifier comprises the **entirety** of the BRT's function. But if that were so, the qualifier would be entirely superfluous. In limiting the delegated power only to that part of the BRT's function which involves "the making of real and personal property assessments," the General Assembly obviously contemplated that it was preserving some other part of the BRT's function.

This does not entirely answer the question before us, however. Acknowledging that the General Assembly intended to retain power over some function of the BRT, the question is whether it is clear, as petitioners would have it, that the General Assembly intended to reserve power over the BRT's

"appellate function." To this extent, the statute may be viewed as ambiguous, calling for construction. *See Delaware County v. First Union Corp.*, 992 A.2d 112, 118–19 (Pa.2010). In this analysis, we may consider, *inter alia*, the occasion and necessity for the statute, the circumstances under which it was enacted, the object to be attained, and contemporaneous legislative history. *See* 1 Pa.C.S. § 1921(c)(1)-(2), (4), (7); *Kirsch v. Pub. Sch. Employees' Ret. Bd.*, 603 Pa. 439, 985 A.2d 671, 676 (2009); *Hannaberry HVAC v. W.C.A.B. (Snyder, Jr.)*, 575 Pa.66, 834 A.2d 524, 533 (2003) (citing legislative history supporting Court's interpretation); *DeLellis v. Borough of Verona*, 541 Pa. 3, 660 A.2d 25, 31 n. 11 (1995) (same).

 In addition to accounting for the qualifier found in the plain language of the statute, petitioners' construction of Section 13132(c) fits neatly into the larger statutory context within which the BRT operates and does not lead to an absurd result. Section 13132(c) is a provision of the General Assembly's Home Rule Act. Via the Home Rule Act, the General Assembly empowered the City to adopt a home rule charter and delegated certain of its legislative powers to City Council. *See generally* 53 P.S. § 13132(a)-(d). The General Assembly transferred legislative power to City Council over the items delineated in Section 13132(a) in 1953 and in Section 13132(c) in 1963, completing consolidation of City and County government. *See* PA. CONST. Art. XIV, § 8 (repealed, now at PA. CONST. Art. IX, § 13). The delegation of power to the City is specific, not general, and is limited to the items listed in Section 13132. *See Truscott*, 111 A.2d at 136–40 (Philadelphia City Council had no power to abolish BRT without grant of power by General Assembly because municipalities are not sovereigns and have no original or fundamental power of legislation).[9] In Philadelphia—the only county of the first

9. Moreover, the City is prohibited from exercising powers "contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly," which provide for the assessment of real or personal property. *See* 53 P.S. § 13133(a)(9). Section 13133(a)(9) governs the City's power to interfere with substantive rules governing valuation of property and not the City's authority to abolish its system of administering assessments, which authority is defined in Section 13132(c). *See*

class presently—the powers of the BRT are specified in several statutes codified at 72 P.S. §§ 5341.1–5341.21, under the title "Assessments in Counties of the First Class."

The statutory scheme provides, as the parties agree, for essentially a two-step property value assessment process. First, the BRT issues annual precepts to assessors and the assessors, upon receipt of precepts, value each property and return valuations to the BRT. 72 P.S. § 5341.7; *see* 72 P.S. § 5020–401(a) (in Philadelphia, BRT shall require appointed assessors "to make annual assessments"). Assessors are local officials appointed and supervised by the BRT. 72 P.S. § 5341.4. The BRT then examines the returns and, if necessary, revises valuations to rectify errors and complete omitted valuations. 72 P.S. § 5341.8. Second, the BRT hears appeals filed by any person "aggrieved by any assessment ... fixed following revision of assessments by the [BRT]." 72 P.S. § 5341.14. The BRT's decision regarding the administrative appeal is in turn appealable *de novo* to the Philadelphia County Court of Common Pleas. 72 P.S. § 5020–518.1; 42 Pa.C.S. § 933(a)(2) (relating to appeals from local government agencies). "The assessments made by the assessors, as revised and supplemented by the [BRT], subject to appeal therefrom as hereinafter in this act provided, ... constitute the assessed value for tax purposes." 72 P.S. § 5341.8.

Against this background, the General Assembly's use of the phrase "making of assessments" in Section 13132(c) logically suggests the ministerial first step of the property value assessment process. The appellate function, although integral to the local taxation process, is a distinctly quasi-judicial review function of the BRT. *Cf. Rogers v. Pa. Bd. of Prob. and Parole*, 555 Pa. 285, 724 A.2d 319 (1999) (distinguishing between agency's ministerial and adjudicative functions); *Kennedy v. Upper Milford Twp. Zoning Hearing Bd.*, 575 Pa. 105, 834 A.2d 1104, 1114 (2003) (local agencies that perform formal fact-finding and deliberative functions in a manner similar to

*generally Board of Prop., Assessment v. County of Allegheny*, 773 A.2d 816 (Pa.Cmwlth.2001) (discussing similar provisions related to property assessment in counties of second class).

that of a court are quasi-judicial bodies). Indeed, City Council implicitly recognized this distinction by reassigning the two functions along the same line of demarcation to two newly-formed entities, the Office of Property Assessments and the Board of Appeals. According to the Reorganization Ordinance, the primary function of the Office of Property Assessments is to "make or supervise the making of all assessments," while the primary function of the Board of Appeals is to "provide for hearings, and make decisions, in all cases of appeals from assessments." Reorganization Ordinance §§ 2–303(1), 2–305(2)(a).

▋ Legislative history also supports petitioners' interpretation.[10] Petitioners attach several pages from the Legislative Journal, containing the transcript of debates dated July 9, 1963, in which individual legislators discussed their understanding of the meaning of Section 13132(c). Petitioners quote the statements of Representative A.M. Lee, who proposed amending Section 13132(c) as follows:

10. Quoting *McCormick*, 564 A.2d at 910 n. 1, the City argues that "what is said in debate, the remarks and understanding of individual legislators, is not relevant in ascertaining the meaning of a statute." The Statutory Construction Act, however, specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required. *See* 1 Pa.C.S. § 1921(c)(7). Notably, the observation in *McCormick* was not offered in the course of statutory construction following a finding of ambiguity, but instead, in the course of what appears to have been a plain language analysis. In that analysis, the Court merely rejected the appellants' reliance on "the remarks of one member of the House of Representatives speaking in support of the Act [under review]." *McCormick, supra.* Although lawmakers' statements during debate are generally not **dispositive** of legislative intent, especially where they serve to challenge the plain language of the statute as enacted, *see, e.g., Martin v. Soblotney*, 502 Pa. 418, 466 A.2d 1022, 1025 n. 5 (1983); *Golden Triangle News, Inc. v. Corbett*, 700 A.2d 1056, 1064 (Pa.Cmwlth.1997) ("legislative history cannot act as a rationale for contradicting the plain meaning of the statute itself"), legislative history "is nonetheless instructive to our analysis and persuasive evidence … [of] the General Assembly's intent." *DeLellis*, 660 A.2d at 31 n. 11; *see Commonwealth v. Wilson*, 529 Pa. 268, 602 A.2d 1290, 1294 n. 4 (1992) (floor debates not dispositive but informative); *Boettger v. Loverro*, 526 Pa. 510, 587 A.2d 712, 718 n. 16 (1991). Here, the legislative history is persuasive and serves to confirm our reading of the statute's language.

Council of the City of Philadelphia shall have full powers to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of the Sheriff, City Commissioners, ~~Board of Revision of Taxes, and~~ Registration Commission *and Board of Revision of Taxes or its successor, with respect to the making of assessments of real and personal property as provided by act of Assembly.*

1963 Pa. Leg. J. 1311–12 (July 9, 1963) (deletions are indicated by a strikethrough and additions are indicated by italics). The amendment was adopted precisely as proposed by Representative Lee and that is the language still governing today. The amendment is significant because the original language authorized unlimited power over the BRT, including the power to abolish the BRT entirely, just as that power was conferred respecting the Sheriff, City Commissioners, and Registration Commission. The amendment, however, limited the City's powers of abolition, organization, etc., to the BRT's function of "making of assessments." As the author of the amendment, Representative Lee's comments are significant. Representative Lee stated:

> My amendments [to Section 13132(c) ] would say that **as to the assessment function, in the first instance that function is within the scope of the grant of authority to city council contained in this bill; however, excepted from that grant of authority would be the latter two functions which I mentioned, the hearing of appeals from assessments** and the functions as providing members of the boards of view in the City of Philadelphia.[11]

> The reason for these amendments [to Section 13132(c) ] is that in performing the appeal function and the board of view function[,] the [BRT] is performing a quasi-judicial function and from their [sic] actions appeals lie to the courts of common pleas. And since they are quasi-judicial functions, it appears proper that these functions should be performed

11. For the purposes of this action, only the BRT's appeal function is at issue.

by an agency appointed by the courts of common pleas in the city of Philadelphia in accordance with existing practice. 1963 Pa. Leg. J. 1312 (July 9, 1963) (emphasis added). *See* P.L. 795, § 1 of August 13, 1963, amending P.L. 1476, § 2 of August 26, 1953. A second speaker, Representative Fineman of Philadelphia, while criticizing the reason for the amendment, confirmed the line of separation regarding the BRT's distinct functions:

This is more properly not an endeavor or an attempt to protect the public, the property owners of the city of Philadelphia, **by separating the taxing power, or rather the assessment-making power[,] and the appeal provisions of the law,** but rather a cynical attempt to insure [sic] the continuation of political patronage to the Republican Party in the city of Philadelphia.

1963 Pa. Leg. J. 1315 (July 9, 1963) (emphasis added).

Politics of the above debate aside, the comments recorded in the Legislative Journal confirm the BRT's interpretation of the statute, particularly in light of both sides' recognition that the BRT performs multiple functions. Both the proponent and an opponent of the Lee amendment perceived the language at issue in this appeal as reserving the power of the General Assembly with regard to abolishment of the BRT and reassignment of its review power. This common understanding confirms that the General Assembly intended this meaning of the statute.

Finally, and again leaving aside the politics of the legislative debate, it is fairly plausible to believe that the statutory qualification also recognized the value of interposing some role for the local Judiciary with respect to the BRT's "quasi-judicial" appeal function. We recognize the City's argument that members of other local agencies performing quasi-judicial functions are appointed exclusively by the executive branch, *see, e.g.,* 53 P.S. § 14757 (mayoral appointment of members to zoning commission), but that point assumes that the General Assembly is obliged to view all such Philadelphia agencies as warranting identical treatment. That clearly is the preroga-

tive of the General Assembly, which in this particular instance singled out the BRT for different treatment. In summary, we find supporting merit in the argument, made by petitioners, that the General Assembly sought to ensure a measure of independence in the BRT by placing appointment of its members in the hands of the Judiciary, and reserving its appellate, quasi-judicial role. *Cf. In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000) (generally discussing Judiciary's independence within political system).

For all of these reasons, we conclude that petitioners' interpretation must prevail. *See McCoy*, 962 A.2d at 1168. City Council's transfer of the BRT's adjudicative function to the Board of Appeals was not authorized by the legislative delegation of power afforded in Section 13132(c) and was *ultra vires*. *See Truscott, supra* (City ordinance abolishing BRT was void because statutory language was clear that City was not authorized to abolish BRT and City had no power to abolish BRT without grant of power by General Assembly).[12] Consequently, we hold that the Reorganization Ordinance is invalid in part.

12. Respecting the BRT's additional claim that the City's action was in violation of separation of powers principles, we note that, although the more common scenario involving separation of powers involves tension between an Act of the General Assembly or an action of the Commonwealth executive branch and the powers of the Judiciary, this Court has recognized that separation of powers tension may also arise in disputes involving county authorities and the local judiciary. *See, e.g., Jefferson County Court Appointed Employees Ass'n v. Pa. Labor Rels. Bd.*, 603 Pa. 482, 985 A.2d 697, 701 n. 3, 706 (2009) (county commissioners' board, acting in its legislative capacity, encroached on Judiciary's authority to hire, fire, and supervise its employees in directing Judiciary to eliminate five trial court employee positions). The tension implicated here, however, is further removed in that the judicial power implicated was delegated by the General Assembly to the local judiciary and is not inherently a judicial function. Indeed, the local judiciary retains a *de novo* appellate function following the completion of the assessment process. *See* 72 P.S. § 5020-518.1; 42 Pa.C.S. § 933(a)(2) (relating to appeals from local government agencies). Thus, the primary tension is not so much separation of powers as a tension between the local legislative action and the state legislative delegation of power. We offer these observations merely to provide context to the BRT's argument. We need not reach the merits of the separation of powers claim in light of our disposition premised upon the statute itself.

## D. *Relief*

 In their application to this Court, petitioners request injunctive relief or, alternatively, writs of mandamus, prohibition, and *quo warranto* to halt the implementation of the Reorganization Ordinance. In Pennsylvania, a permanent injunction will issue if the party establishes his or her clear right to relief. "[T]he party need not establish either irreparable harm or immediate relief," as is necessary when seeking a preliminary injunction, and "a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Buffalo Twp. v. Jones,* 571 Pa. 637, 813 A.2d 659, 663 (2002).

 Further, we may issue writs of mandamus and/or prohibition where a petitioner has a clear legal right, the responding public official has a corresponding duty, and no other adequate and appropriate remedy at law exists. *See Delaware River Port Auth. v. Thornburgh,* 508 Pa. 11, 493 A.2d 1351, 1355 (1985) (mandamus); *Philadelphia Newspapers, supra,* 387 A.2d at 430 (prohibition). The writ of mandamus compels official performance of a ministerial act or mandatory duty, *see Thornburgh,* 493 A.2d at 1355, while a writ of prohibition restrains an offending official "from continuing . . . unwarranted conduct when continuation threatens imminent harm to the individual on whose behalf the writ is issued," *Philadelphia Newspapers,* 387 A.2d at 430 n. 11. Finally, a writ of *quo warranto* is a means by which to test title or right to public office. *Pennsylvania Attorney Gen. Corbett v. Griffin,* 596 Pa. 549, 946 A.2d 668, 672 n. 2 (2008). "A complaint in *quo warranto* is aimed at the right to exercise the powers of the office, which is a public injury, rather than an attack upon the propriety of the actions performed while in office, which would be a private injury." *Judicial Conduct Bd. v. Griffin,* 591 Pa. 351, 918 A.2d 87, 93 (2007).

 Preliminarily, we note that a request for a writ of *quo warranto* is not appropriate here, where petitioners do not directly challenge any individual person's right to public office, and indeed have not named and served any such

individual, but instead are testing the validity of a City Council ordinance. Petitioners, however, have established their clear right to relief and that an adequate remedy at law does not exist. As a result, a permanent injunction is appropriate. In light of this disposition, we dismiss the request for a preliminary injunction, and the alternative requests for writs of mandamus and prohibition as moot.

▮▮▮ The scope of the permanent injunction is limited, as we agree with the City that the offending portions of the Reorganization Ordinance are severable. Although petitioners do not address the issue of severability directly, they do concede that the Reorganization Ordinance is valid insofar as it reassigns the function of making assessments to the newly-formed Office of Property Assessment. "[T]he severance principle has its roots in a jurisprudential doctrine ... and the standard itself reflects the experience of the common law." *Stilp*, 905 A.2d at 972. Generally, if the provision of a statute—or, as here, an ordinance—is found invalid, the remainder of the legislative act will not be affected by the invalidity unless we find that the valid provisions "are so essentially and inseparably connected with, and so depend upon, the void provision" that it cannot be presumed that the legislating body "would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." *Id.* at 970 (quoting 1 Pa.C.S. § 1925). Here, the provisions creating the Office of Property Assessment and separating its functions from the BRT stand independently, are complete, and are capable of being placed into effect in accordance with the intent of City Council and the Philadelphia electorate, which ratified them. Accordingly, we issue a permanent injunction with respect to the following provisions of the Reorganization Ordinance, exclusively:

— Section 1, purporting to amend Title 2, § 2–113 of the Philadelphia Code, insofar as it abolishes the BRT with respect to its appellate function;

— Section 1, purporting to amend Title 2 of the Philadelphia Code by adding §§ 2–301 to 2–303;

— Section 1, purporting to amend Title 2 of the Philadelphia Code, insofar as it transfers BRT employees to the Board of Appeals; and

— Section 1, purporting to amend Title 2 of the Philadelphia Code, insofar as it makes any reference to the Board of Appeals rather than the BRT performing the BRT's appellate function.

## II. *The Salary Ordinance*

Petitioners separately request that we exercise jurisdiction over their challenge to the validity of the Salary Ordinance.[13] They claim that, in its bid to abolish and replace the BRT, the City expanded the controversy regarding the dissolution of the BRT "to directly and immediately produce destructive effects upon the [BRT] and its individual officials." According to petitioners, the Salary Ordinance amounts to a public "constructive discharge" of BRT members in the middle of their terms of appointment. They also claim that the City's action flouted the Pennsylvania Constitution and this Court's recent decision prohibiting municipalities from diminishing the "salary or emoluments" of public officials after their appointment. *See* PA. CONST. Art. III, § 27; *Buckwalter v. Borough of Phoenixville*, 603 Pa. 534, 985 A.2d 728 (2009).[14] Petitioners postulate that the present matter is of immediate public importance because "each day that this open offense is allowed to continue" is an affront to "the public's right to conduct by the City obedient to the Constitution of Pennsylvania" and to the affected individuals' rights. Petitioners also insist that no

13. As noted *supra*, the only petitioners remaining in this suit are BRT members acting in their individual, not official, capacities.

14. Article III, Section 27 of our Constitution states that "[n]o law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment." In *Buckwalter*, we granted allocatur to "determine whether [that Constitutional provision] prohibits mid-term compensation changes for elected municipal officers by means of a municipal ordinance." 985 A.2d at 730. We specifically decided that the term "law" in the constitutional provision included municipal ordinances. *Id.* at 733.

action at law for damages exists that would remedy the City's unconstitutional conduct and remove the stigma placed on the City by its unconstitutional ordinance. Petitioners request an injunction to halt the application of the Salary Ordinance as well as an "equitable award of back pay."

The City responds that the validity of the Salary Ordinance is a separate issue and does not raise the same immediate public concerns as petitioners' first claim. In the City's view, the Salary Ordinance dispute is individual to petitioners and should proceed in the normal course, beginning with factual and legal determinations by the court of common pleas. The City notes that it may raise fact-bound issues in response to petitioners' claim, serve discovery, and file a counterclaim, all of which are "more appropriate for resolution in a trial court."

 We agree with the City that this matter is more properly relegated to the court of common pleas in the first instance. The parties' dispute over the propriety of reducing BRT members' salaries, while important, does not require accelerated review by this Court out of the ordinary course, nor are petitioners' arguments regarding the public importance of the issue they present particularly compelling, such that exercise of this Court's extraordinary jurisdiction would be appropriate. *See Vaccone v. Syken*, 587 Pa. 380, 899 A.2d 1103, 1108 (2006) (circumstances of disqualification of petitioner's counsel not extreme, or unusual, or of such public importance, that general rule regarding sparing use of extraordinary jurisdiction would not apply). Accordingly, petitioners' request for the exercise of extraordinary jurisdiction or King's Bench Power in this regard is denied,[15] and thus we do not pass upon the requests for injunctive and equitable relief, and for writs of mandamus and prohibition to halt the continued operation of the City's Salary Ordinance.

III. *Conclusion and Mandate*

We hold that the Philadelphia City Council Ordinance dated December 17, 2009, amending Title 2 of the Philadelphia Code

15. As we explained *supra,* only the request for extraordinary jurisdiction, not King's Bench jurisdiction, is proper here.

with respect to the functions and existence of the BRT, violates the General Assembly's Public Law 795, § 1 of Aug. 13, 1963, *see* 53 P.S. § 13132(c), insofar as it eliminates the BRT's quasi-judicial appellate function and abolishes the BRT entirely, replacing it with the newly-created Board of Property Assessment Appeals. We also find that the invalid provisions are severable from the remainder of the Ordinance. The Ordinance provisions amending Title 2 of the Philadelphia Code, which relate solely to the BRT's administrative or ministerial function of making assessments, remain in force.

Accordingly, it is ordered that the Mayor of the City of Philadelphia, the City Council of Philadelphia, and their officers, agents and employees, are hereby restrained and enjoined from carrying into effect or enforcing any of the following provisions of the Ordinance:

(1) Section 1, purporting to amend Title 2, § 2–113 of the Philadelphia Code, insofar as it abolishes the BRT with respect to its appellate function;

(2) Section 1, purporting to amend Title 2 of the Philadelphia Code by adding §§ 2–301 to 2–303;

(3) Section 1, purporting to amend Title 2 of the Philadelphia Code, insofar as it transfers BRT employees to the Board of Appeals; and

(4) Section 1, purporting to amend Title 2 of the Philadelphia Code, insofar as it makes any reference to the Board of Appeals rather than the BRT performing the BRT's appellate function.

Petitioners' requests for a preliminary injunction and the alternate remedies of *quo warranto*, prohibition, and mandamus are dismissed.

With respect to the Philadelphia City Council Ordinance dated April 22, 2010, amending Section 20–304 of the Philadelphia Code, we decline to exercise plenary jurisdiction. The dispute can proceed in the ordinary course in the Philadelphia County Court of Common Pleas.

It is so ordered.

138

APPENDIX A

## City of Philadelphia

(Bill No. 090706)

AN ORDINANCE

Amending Title 2 of The Philadelphia Code, entitled "City–County Consolidation," by abolishing the Board of Revision of Taxes, by creating an Office of Property Assessment which shall have the powers, functions and duties of the Board of Revision of Taxes with respect to the initial making of property assessments; by assigning certain duties to the Department of Records (as the successor to the Recorder of Deeds) with respect to filing certain information with the new Office of Property Assessment; by creating a new Board of Property Assessment Appeals ("Board"), which shall have the powers, functions and duties of the Board of Revision of Taxes with respect to appeals from property assessments; and by creating a Board of Property Assessment Appeals Nominating Panel to nominate candidates for appointment to the Board; and providing for submission of such amendment for the approval or disapproval of the qualified electors of the City of Philadelphia; fixing the date of a special election for such purpose; prescribing the form of ballot question to be voted on; and authorizing the appropriate officers to publish notice and to make arrangements for the special election; all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Title 2 of The Philadelphia Code is hereby amended to read as follows:

## TITLE 2. CITY–COUNTY CONSOLIDATION.

### CHAPTER 2–100. CITY–COUNTY CONSOLIDATION.

\* \* \*

§ 2–113. Board of Revision of Taxes.

[A duty is hereby imposed on the Board of Revision of Taxes to reassess annually every parcel of real property in the City. No assessment of a parcel of real property for any year shall be forwarded to the Director of Finance until every parcel of real property in the City has been reassessed for that year.] *The Board of Revision of Taxes shall cease to exist after September 30, 2010, and, effective October 1, 2010, all powers, functions and duties previously exercised and performed by the Board of Revision of Taxes shall be exercised and performed by the Board of Property Assessment Appeals and the Office of Property Assessment, all as provided in Chapter 2–300.*

### *CHAPTER 2–300. PROPERTY ASSESSMENT.*

*§ 2–301. Board of Property Assessment Appeals Nominating Panel.*

*(1) The Board of Property Assessment Appeals Nominating Panel ("Nominating Panel") is hereby created. It shall consist of seven members, one each appointed by the Mayor, the Council President, the Philadelphia Bar Association, the Building Industry Association of Philadelphia, the Housing Association of Delaware Valley, the Greater Philadelphia Association of Realtors, and the Southeast Chapter of the Assessors' Association of Pennsylvania. If any of the designated appointing organizations ceases to exist, or formally notifies the other organizations that it declines to participate, the remaining members of the Nominating Panel shall by a majority vote replace the appointing organization with another organization of a similar nature.*

*(2) The Nominating Panel shall nominate candidates for appointment to the Board of Property Assessment Appeals, and for that purpose shall follow the procedure set forth in*

*Section 3–1003 of the Philadelphia Home Rule Charter, provided that at least thirty days before making nominations, the Nominating Panel by public notice shall solicit applicants to serve on the Board, and provided further that the Nominating Panel shall make nominations only from among those who have applied.*

*§ 2–302. Board of Property Assessment Appeals; Composition and Appointment.*

*(1) The Board of Property Assessment Appeals ("Board of Appeals" or "Board") is hereby created, effective immediately.*

*(2) The Board of Appeals shall consist of seven members, all of whom shall be residents of the City. Two of the members shall have at least ten years' experience as, and currently be, a real estate appraiser or real estate assessor certified by the Commonwealth of Pennsylvania, and two of the other members shall have at least ten years' experience as a practicing attorney at law with residential or commercial valuation expertise. The remaining members shall have relevant qualifications, so long as at least one is a homeowner and/or commercial property owner within the City.*

*(3) The members of the Board of Appeals shall be appointed by the Mayor, with the advice and consent of a majority of all the members of the Council, from among the nominations submitted to the Mayor by the Board of Property Assessment Appeals Nominating Panel.*

*(4) Except as provided for initial terms, members shall be appointed to terms of five years. Members shall serve until their successors have been appointed and qualified, except that all appointments to fill vacancies happening in any manner other than by the expiration of a term shall be only for the remainder of the unexpired term.*

*(5) Of the seven members first appointed, one shall be appointed to a term of two years, two shall be appointed to terms of three years, two shall be appointed to terms of four*

years, and two shall be appointed to terms of five years. Initial terms shall begin on October 1, 2010.

(6) Members may only be removed for cause. To remove a member, the Mayor shall present the member with a written statement of the reasons proposed for removal. The Mayor shall forward a copy of such statement to the Council. If the member wishes to contest removal, the member shall, within ten days after receiving the written statement from the Mayor, notify in writing the Mayor and the President of Council. The Council shall promptly thereafter provide the member an opportunity for a hearing before the Council. Following such hearing, or if the member waives the opportunity for a hearing, Council may remove the member by a resolution adopted by the vote of two-thirds of all the members of the Council.

(7) The Board of Appeals shall by majority vote select a Chair, a Vice–Chair and a Secretary from among its members.

(8) Except as Council may otherwise ordain from time to time, the Chair of the Board of Appeals shall receive an annual salary of fifty thousand dollars ($50,000), the Secretary shall receive an annual salary of forty-five thousand dollars ($45,000), and each remaining member of the Board shall receive one hundred fifty dollars ($150) for each day the member attends a Board hearing or meeting or both, up to a maximum of forty thousand dollars ($40,000) per year.

(8) The Board of Appeals shall retain such employees as are required to conduct the work of the Board.

§ 2–303. Board of Property Assessment Appeals; Powers and Duties.

(1) The Board of Appeals shall provide for hearings, and make decisions, in all cases of appeals from assessments made in calendar year 2010 and thereafter. Hearings shall be before either a member or members of the Board of Appeals, or before hearing officers appointed by the Board.

*(2) Following a hearing, and before the decision, the member(s) of the Board who heard the appeal or the hearing officer, as the case may be, shall provide a written or oral report of the hearing to every member of the Board who did not hear the appeal and who participates in the decision. The report shall include a recommendation to the Board and the basis of such recommendation.*

*(3) The Board of Appeals shall promulgate and make available on the City's official website Assessment Appeals Standards and Practices Regulations that are consistent with applicable law, and that are based on industry standards as determined by nationally recognized assessment and appraisal industry organizations. Such regulations shall address, among such other matters as the Board deems appropriate, the following:*

*(a) What may be appealed to the Board of Appeals, including, but not limited to, eligibility for and the amount of tax exemptions and property tax abatements.*

*(b) The procedure for filing and hearing appeals.*

*(c) The rules of evidence applicable to appeals.*

*(d) The methodology by which appeals decisions are to be made.*

*(e) The format and content of decisions by the Board of Appeals.*

*(f) A reasonable time period in which appeals must be heard after filing.*

*(g) A requirement that notice of hearings be given to all parties with enough time to allow adequate preparation by participants.*

*(4) The Board of Appeals shall, every six months, file a written report on its activities with Council and post the report on the City's internet website.*

*(5) The Board of Appeals shall make available on-line the results of each appeal within seven (7) days of the Board's decision. Such results shall include, at a minimum, the following information for the property that is the subject of*

the appeal: the property address; the name of the property owner; the assessed value of the property for the past five (5) years; and the resulting assessment from the decision rendered by the Board of Appeals.

(6) The Board of Appeals shall perform and exercise such other powers and duties as may be conferred or imposed upon it by law or ordinance.

§ 2-304. Office of Property Assessment; Creation; Principal Officers.

(1) The Office of Property Assessment is hereby created within the Executive/Administrative branch of City government, effective immediately.

(2) The Mayor, with the advice and consent of a majority of all the members of the Council, shall appoint a Chief Assessment Officer who shall direct the work of the Office of Property Assessment.

(3) The Chief Assessment Officer shall serve for a term of four years, with the initial term commencing July 1, 2010, and shall be exempt from civil service, but may only be removed for cause under the procedure set forth in subsection 2-302(6).

(4) The Chief Assessment Officer shall appoint such other employees as are required to conduct the work of the Office, but the number and compensation of such employees shall be subject to the approval of the Mayor. The Chief Assessment Officer shall be treated as the head of a department for purposes of the appointment of deputies under Section 3-701 of the Philadelphia Home Rule Charter, and the Office of Property Assessment shall be treated as a department for purposes of determining the number of such deputies who may be exempt from civil service under Section 7-301 of the Philadelphia Home Rule Charter. All employees whose work responsibilities include determining real property assessments and valuations shall have relevant and appropriate qualifications, including any state-regulated certifications, as determined by the Civil Service Commission in consultation with the Chief Assessment Officer.

*(5) The Chief Assessment Officer shall be an International Association of Assessing Officers (IAAO) Certified Assessment Evaluator (CAE), or hold the highest-ranking Commonwealth appraiser's license, shall have had a minimum of ten years of progressively responsible professional experience in the management of property valuation, and shall have a firm command of assessment and taxation practices.*

*§ 2–305. Office of Property Assessment; Chief Assessment Officer; Powers and Duties.*

*(1) Beginning with assessments made in calendar year 2011 and thereafter, the Office of Property Assessment shall make and supervise the making of all assessments and valuations of all subjects of real property taxation.*

*(2) Except as Council may ordain from time to time, the Chief Assessment Officer shall:*

*(a) Make or supervise the making of all assessments and valuations of all subjects of taxation in accordance with law, ordinance, and industry standards.*

*(b) Ensure the annual revisions and equalization of all such assessments and valuations.*

*(c) Certify all assessments after their revision and equalization.*

*(d) Promulgate and make available on the City's official website Assessment Standards and Practices Regulations that with respect to assessments made in calendar year 2011 and thereafter:*

*(i) Set forth a methodology for the valuation of properties for taxation purposes.*

*(ii) Set standards for property assessments that shall include, at a minimum, an acceptable limit on the deviation of the Common Level Ratio from the Predetermined Ratio, an acceptable limit on the Coefficient of Dispersion, and an acceptable range for the Price–Related Differential. The measurements against the standards shall be calculated following nationally recognized practices.*

*(iii) Require an annual reassessment through a professionally developed and maintained Computer Assisted Mass Appraisal (CAMA) system.*

*(iv) Require that the annual reassessment be applied to all properties, including tax exempt properties, public utility property, and residential trailers.*

*(v) Establish standards for recommending tax exemption for properties.*

*(vi) Establish procedures for changing values on an administrative basis (for example, in the event of catastrophic loss or errors in data).*

*(e) Ensure access to public records regarding assessments in accordance with applicable law, and see to it that such records are made available on the City's official website.*

*(f) Ensure that notices of changes in assessments shall be sent to the Revenue Department upon their certification.*

*(g) Serve as the City's contact for information and complaints, other than appeals, about assessment policies and practices.*

*(h) Ensure that annual revisions and equalizations are done in accordance with law, ordinance, and industry standards.*

*(i) Be responsible for the numbering of all buildings, houses, condominiums, or other structures located within the City, in accordance with applicable law or ordinance.*

*(j) Ensure the establishment and maintenance of records of an adequate description of properties to assist in the determination of the value of those properties, and to permit inspection thereof by the public at all times during office hours.*

*(k) Consider and determine applications for tax abatement and tax exemption.*

*(l) Ensure the defense of assessed values.*

*(m) Maintain a register which shall show the present valuation and assessment of all real property and, from time to time as the same are made, all additions thereto and*

changes thereof, together with the name of all persons responsible for any changes in the assessment or valuation of any such property and reason for such changes.

(n) Receive from the Department of Records a report of every deed or conveyance of land entered in the office for recording, which record shall set forth the following information: the recording date of the deed or conveyance; the names of the grantor and grantee in the deed; the consideration paid; and the location of the property. It shall be the further duty of the Department of Records at intervals to file such reports in the Office of Property Assessment together with a certificate appended thereto that such record is correct.

(o) Maintain an on-line database which includes, at a minimum, the following information about each property within the City: the characteristics of the property; ownership information; certified values for the last five (5) years, showing the baseline assessment of the property as well as the effect of any changes based on an exemption or abatement; tax information, including the property's real estate tax and tax balances; zoning designation; and the existence of special conditions or certifications regarding the property, including whether the property is subject to any historical designations.

(p) Perform such other duties as may be assigned or delegated by the Mayor.

(q) Have all powers and duties of the former Board of Revision of Taxes not assigned by this Chapter to the Board of Property Assessment Appeals.

§ 2–306. Provisions of General Applicability.

(1) The Board of Property Assessment Appeals and the Office of Property Assessment shall function in accordance with all applicable provisions of the Philadelphia Home Rule Charter.

(2) The provisions of this Chapter shall be subject to all provisions relating to or governing tax assessments set forth in the statute governing the making of assessments in Counties of the First Class (72 P.S. § 5341.1 et seq.), all applicable

*provisions of the General County Assessment Law (72 P.S. § 5020–101 et seq.), and all other applicable laws.*

*(3) The provisions of Section 2–110 of The Philadelphia Code shall apply in connection with adoption of this Chapter.*

*§ 2–307. Transfer of Existing Employees.*

*(1) Those persons employed by or assigned to the Board of Revision of Taxes on the date the Board of Revision of Taxes ceases to exist shall become employees of or shall be assigned to the Board of Property Assessment Appeals, if they are regularly occupied in connection with the functions and duties transferred to that Board, or employees of or assigned to the Office of Property Assessment, if they are regularly occupied in connection with the functions and duties transferred to that Office.*

*(2) The Board of Revision of Taxes shall work with the appropriate officers of the City to ensure an orderly transition of employees and responsibilities.*

SECTION 2. This Ordinance shall be submitted to the qualified electors of the City of Philadelphia for their approval or disapproval at a special election to be held on May 18, 2010, and shall not take effect unless so approved. There shall be placed on the ballot the following question to be answered "Yes" or "No" by the qualified electors participating in the election:

Shall the Board of Revision of Taxes be abolished, and its powers, functions and duties be reassigned to a new Office of Property Assessment (with respect to the making of assessments) and to a Board of Property Assessment Appeals (with respect to appeals from such assessments), with the members of the Board appointed from nominations made by a Board of Property Assessment Appeals Nominating Panel?

SECTION 3. The Clerk of Council is hereby directed to have printed in pamphlet form, in sufficient number for general distribution, the proposed amendment to Chapter 2–100 of

The Philadelphia Code, together with the ballot question set forth in Section 2 of this Ordinance.

SECTION 4. The Clerk of Council is hereby directed to cause to be published in three (3) newspapers of general circulation in the City and in the Legal Intelligencer the proposed amendment to Chapter 2–100 of The Philadelphia Code, together with the ballot question set forth in Section 2 of this Ordinance, once a week during the three (3) weeks preceding the election on May 18, 2010; and further, at such other time and in such other manner as he may consider desirable.

SECTION 5. The Mayor is hereby authorized and directed to issue a proclamation giving at least thirty (30) days' notice of such election. The Clerk of Council shall cause a copy of the proclamation to be published, together with the notice provided for in Section 4 of this Ordinance.

SECTION 6. The appropriate officers are authorized and directed to take such action as may be required for the holding of an election on the ballot question set forth in Section 2 of this Ordinance as provided for by the laws of the Commonwealth of Pennsylvania.

SECTION 7. The Clerk of Council is directed to provide a certified copy of this Ordinance to the Philadelphia City Commissioners immediately upon its adoption into law.

---

**Explanation:**

[Brackets] indicate matter deleted.

*Italics* indicate new matter added.

CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on December 17, 2009. The Bill was Signed by the Mayor on January 23, 2010.

/s/ Michael A. Decker
Michael A. Decker
Chief Clerk of the City Council

**City of Philadelphia**

(Bill No. 100212)

AN ORDINANCE

Amending Section 20-304, entitled "Compensation for Members of Boards, Commissions, Committees and Councils," by revising the compensation for members of the Board of Revision of Taxes, under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Section 20-304 of The Philadelphia Code is amended to read as follows:

§ 20-304. Compensation for Members of Boards, Commissions, Committees and Councils.

\* \* \*

(7) Board of Revision of Taxes. [Each member of the Board of Revision of Taxes shall receive an annual salary of seventy thousand ($70,000) dollars.] The Secretary *of the Board of Revision of Taxes* shall receive an annual salary of [seventy two thousand ($72,000) ] *forty-five thousand dollars ($45,000).* The Chairman of the Board of Revision of Taxes shall receive an annual salary of [seventy five thousand ($75,000) ] *fifty thousand dollars ($50,000). Each remaining member of the Board shall receive one hundred and fifty dollars ($150) as compensation for each day the member attends a Board meeting or hearing or both, or such higher amount as required by law, but in no case more than forty-thousand dollars ($40,000) per year.*

\* \* \*

150

SECTION 2. This Ordinance shall be effective immediately.

**Explanation:**

[Brackets] indicate matter deleted.

*Italics* indicate new matter added.

CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on April 22, 2010. The Bill was Signed by the Mayor on April 22, 2010.

/s/ Michael A. Decker

Michael A. Decker

Chief Clerk of the City Council