**[J-60-2024] [MO: Todd, C.J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 13, |
| | : | 2023, at No. 1008 WDA 2021, |
| v. | : | Affirming the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered December 19, 2016, at No. |
| DEREK LEE, | : | CP-02-CR-0016878-2014. |
| | : | |
| Appellant | : | ARGUED: October 8, 2024 |

**CONCURRING OPINION**

**JUSTICE MUNDY**                                      **DECIDED: MARCH 26, 2026**

I agree with the majority that under the Supreme Court's cases there is no basis to conclude that life without parole as a penalty for an adult convicted of felony murder violates the Eighth Amendment. I also agree that Article I, Section 13 of the Pennsylvania Constitution prohibits a mandatory sentence of life without parole for felony murder in relation, specifically, to defendants who did not kill, attempt to kill, or intend that anyone be killed. As that is all this case decides, I believe some of the language used by the majority in describing its holding may be imprecise, at least to the extent it can be construed to encompass second-degree murderers who either killed or intended to kill. *See, e.g.*, Majority Op. at 70 ("Accordingly, we conclude Section 13's prohibition on cruel punishments proscribes a sentencing model which mandates the imposition of life imprisonment without parole for felony murder."). The limited scope of the present decision is discussed below.

First, though, the seriousness of the offense of felony murder should not be understated. Felonies are dangerous crimes, and the General Assembly has broad latitude to set the penalty when a defendant willingly participates in a predicate felony and someone is killed during its commission. *See* 18 Pa.C.S. § 2502(d) (listing the predicate felonies as robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary, and kidnapping); *cf. Commonwealth ex rel. Corbett v. Griffin*, 946 A.2d 668, 675 (Pa. 2008) ("[T]he Legislature's determination as to whether a particular offense is serious enough at a given time to warrant the status of felony reflects the public will as expressed through the ballot box."). The *result* of dangerous conduct often determines its criminality, and anyone who voluntarily embarks upon a predicate felony as principal or accomplice is assumed to be aware the crime could lead to violence, up to and including death. *See Commonwealth v. Legg*, 417 A.2d 1152, 1154 (Pa. 1980) (under a reasonable-person standard, the actor knew or should have known death might result from the felony and proceeded with it anyway). Thus, we have explained that, with felony murder, the defendant acted with "malice incident to the perpetration of the initial felony," which is then extended by law to the homicide, making it murder. *Commonwealth v. Yuknavich*, 295 A.2d 290, 292 (Pa. 1972). Some predicate crimes are so inherently dangerous that the legislature may impose the severest penalty short of execution when they end in someone's death. Courts should not lose sight that an unjustified killing is the ultimate act of evil, one that completely erases another person's entire existence and potential. *See Graham v. Florida*, 560 U.S. 48, 69 (2010).

The instant case is illustrative. Appellant willingly participated in an armed home invasion and robbery, and purposefully engaged in assaultive behavior in the form of tasing and pistol-whipping the victim. Anyone who invades someone else's home should expect a high probability that violence will occur, which obviously could lead to death.

The added factor that the invasion was armed and the perpetrators arguably kidnapped the victims by forcing them into the basement only drives that point home.[1] In such instances, the theoretical foundations of the felony-murder doctrine stand on solid ground, including transferred malice and strict liability.

In other instances, the felony-murder defendant may play a relatively minor role, such as the getaway driver for an unarmed confederate. *See* Majority Op. at 63 (distinguishing the "lookout" from the triggerman). Through youth or naiveté, he may expect the incident to involve the stealing of a few items from a convenience store and little else. *Cf*. Concurring Op. at 3 (Wecht, J.) (describing that the driver may only intend to "make off with some ill-gotten gains"). In such circumstances, the driver is still guilty of a serious crime. He will have waited in a nearby vehicle to help the actual robber escape with stolen goods. And the robbery itself must, to constitute a robbery, be undertaken with at least the threat of immediate serious bodily injury, *see* 18 Pa.C.S. § 3701(a)(1) – a threat even an unarmed person is capable of making through deception or physicality. Even if the store clerk is not physically harmed in the course of the robbery, moreover, the event may be terrorizing, and either he or someone else will have been unjustly deprived of property for which they are presumed to have labored. But as for the getaway driver who had no intention that physical harm would come to anyone, and who did not attempt to harm anyone – as to that person, even if one might suggest a lengthy prison sentence is appropriate, incarcerating him for life without parole based on such conduct does appear to fit the description of "cruel" in the *constitutional* sense. *See* Concurring Op. at 10-11 (Dougherty, J.).

---

[1] *See* 18 Pa.C.S. § 2901(a) (defining kidnapping to include unlawfully removing another person "a substantial distance under the circumstances from the place where he is found," or confining another person for a substantial period in a place of isolation with the intent to commit any felony or terrorize the victim).

Turning to the present case, this is, in effect, a facial challenge that involves only a subset of defendants convicted of felony murder. Appellant framed the issue subject to the assumption that he "did not kill or intend to kill," and that is the constitutional issue we accepted for review:

> Is [Appellant's] mandatory sentence of life imprisonment with no possibility of parole unconstitutional under Article I, § 13 of the Constitution of Pennsylvania where he was convicted of second-degree murder *in which he did not kill or intend to kill and therefore had categorically-diminished culpability*, and where Article I, § 13 should provide better protections in those circumstances than the Eighth Amendment to the U.S. Constitution?

*Commonwealth v. Lee*, 313 A.3d 452 (Pa. 2024) (*per curiam*) (emphasis added). Consistent with the issue as articulated, Appellant argues his challenge should be sustained precisely because defendants who "did not kill or intend to kill" are less culpable. Brief for Appellant at 54. He continues by reference to *Graham* and *Enmund v. Florida*, 458 U.S. 782 (1982). *Enmund* affirmed that in a felony-murder prosecution the reviewing court's proportionality analysis should focus on the defendant's culpability and not that of the person who killed the victim, *see Enmund*, 548 at 798, and it barred the death penalty for a robbery accomplice who did not kill, attempt to kill, or intend or contemplate that a life would be taken during the robbery. *See id*. at 801. For its part, *Graham* explained that a juvenile offender who did not kill or intend to kill has diminished moral liability both because of his youth *and* because of the absence of homicidal conduct or intent. *See Graham*, 569 U.S. at 69 (expressing that the offender's blameworthiness is "twice diminished"). Based on these decisions, Appellant argues:

> Defendants who do not kill, attempt to kill, or intend to kill are therefore less morally culpable than those who do, and are therefore less deserving of the most severe punishments. . . . Under the [United States Supreme] Court's long-standing proportionality framework, a punishment is categorically disproportionate to the offense if there are "mismatches between the culpability of a class of offenders and the severity of the penalty."

Brief for Appellant at 55-56 (quoting *Miller v. Alabama*, 567 U.S. 460, 470 (2012)).

All of this demonstrates we are not presently asked to decide whether a mandatory sentence of life without parole violates Section 13 for a second-degree murderer who killed, attempted to kill, or intended to kill. We are "limited to the issue as it was framed in the petition for allowance of appeal," *Briggs v. Sw. Energy Prod. Co.*, 224 A.3d 334, 350 (Pa. 2020), and our mandate is to "decide the discrete legal issue presented to us." *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 718 (Pa. 2009). It is worth noting that someone who did not kill the homicide victim might have intended to do so. *See, e.g.*, *Sellers v. People*, 560 P.3d 954 (Colo. 2024) (upholding mandatory life without parole for a defendant convicted of felony murder, who fired a weapon at the victim but missed).[2] Alternatively, a person might kill another individual during the course of a felony, albeit without the specific intent required for first-degree murder. *See, e.g.*, *Commonwealth v. Wellman*, 344 A.3d 13 (Pa. Super. 2025). *See generally Commonwealth v. Mickell*, 729 A.2d 566, 569 (Pa. 1999) (explaining the difference between the requisite malice for first- and second-degree murder). But we must presume for purposes of today's decision that Appellant neither killed nor intended or contemplated that a life would be lost during the robbery in which he participated.

The inevitable consequence is that our present ruling does not encompass a determination that mandatory life without parole violates Section 13 vis-à-vis a different class of second-degree murderers: those who killed, attempted to kill, or intended to kill. Such defendants lie outside the scope of the issue presented to this Court and resolved by it. To the extent this case may be viewed as presenting a facial challenge based on a

---

[2] A similar circumstance would arise if the defendant shot at a store clerk, intending to kill him, and the clerk returned fire, killing the defendant's coconspirator or a bystander (or the confederate killed the bystander). *But cf. Commonwealth v. Redline*, 137 A.2d 472 (Pa. 1958) (where police used justifiable force to kill the defendant's confederate in a shootout, the defendant was not guilty of murder at common law).

categorical prohibition, *see* Majority Op. at 8 ("Appellant raises a facial challenge."), that category is limited by the framing of the issue. The Commonwealth points out, correctly, that the General Assembly is authorized to "define grades of murder and assign sentences to each." Brief for Appellee at 16. That body's enactments enjoy a strong presumption of validity and will only be invalidated if they violate the Constitution "clearly, palpably, and plainly." *Ferguson v. PennDOT*, 340 A.3d 278, 285 (Pa. 2025). Deference to the legislative judgment applies with special force where contemporary standards for criminal punishment are concerned, as those standards are "peculiarly questions of legislative policy." *Commonwealth v. Hairston*, 249 A.3d 1046, 1056 (Pa. 2021) (quoting *Gregg v. Georgia*, 428 U.S. 153, 176 (1976)). These observations, in turn, counsel against interpreting our present ruling as broadly invalidating Pennsylvania's felony-murder sentencing scheme. The General Assembly has determined, *inter alia*, that all second-degree murderers who *did* kill, attempt to kill, or intend to kill, are to be sentenced to life without parole. That legislative determination is not before us, and nothing in this decision indicates it is inconsistent with the Pennsylvania Constitution.

Although Appellant framed his issue in terms of his "categorically-diminished culpability," his utilization of the word *categorical* should not be interpreted in the technical sense in which the United States Supreme Court uses that term in its Eighth Amendment jurisprudence. The Supreme Court has drawn a distinction under the Eighth Amendment between case-by-case review for gross disproportionality, and a broader consideration of societal standards that identify a national consensus and independent judgments about the penalty. *See Graham*, 560 U.S. at 60-61. This categorical approach has been applied mainly to defendants convicted of non-homicide offenses, juvenile offenders, and offenders with certain intellectual disabilities. *See id*. at 61 (citing *Kennedy v. Louisiana*, 554 U.S. 407 (2008), *Roper v. Simmons*, 543 U.S. 551 (2005), and *Atkins v. Virginia*, 536

U.S. 304 (2002)). Appellant does not fall into any of those categories, and there is nothing in today's decision suggesting it is grounded on a national consensus. Rather than try to shoehorn the Supreme Court's "categorical" language into Pennsylvania constitutional law, I believe it appropriate to describe the instant case as raising a *limited facial challenge*. *Cf. United State v. Blount*, 764 F. Supp. 3d 281, 296-97 (W.D. Pa. 2025) (addressing a limited facial challenge to a federal statute). As mentioned above, Appellant is not seeking to invalidate life-without-parole sentences for all felony murderers, only for a clearly-defined subset of them (those who did not kill or intend to kill). In that sense the challenge is limited. But as to that subset of felony murderers, the challenge is facial. This is because of the way the issue is presented and argued. Appellant does not rely on any facet of his specific conduct that would differentiate him from any other defendant convicted of second-degree murder who did not kill, attempt to kill, or intend to kill. Nor does the majority. Consequently, by deeming Appellant's challenge meritorious, the majority necessarily invalidates the statute as to a class of parties who are not before the court, namely, all second-degree murderers who did not kill, attempt to kill, or intend to kill. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (discounting any "as-applied" label where the claims forwarded by the corporate party would, if meritorious, invalidate the challenged statute as to all corporations).

I am also hesitant to the extent my colleagues may be interpreted to suggest a sentence of life without parole for Appellant is unconstitutional. *See, e.g.*, Concurring Op. at 6-7 (Dougherty, J.). That is not the issue before us. The issue is whether Pennsylvania statutory law may, in Appellant's circumstances, make that sentence mandatory rather than discretionary – *i.e.*, imposed without the sentencing court's ability to consider the defendant's character and record, or the circumstances of his offense. The issue is thus similar to the one raised in *Miller v. Alabama*, 567 U.S. 460 (2012), where the Supreme

Court invalidated mandatory life without parole for juvenile offenders because it precluded the sentencing court from accounting for the juvenile's age, the attendant characteristics of youth, and the circumstances of the offense. *See id*. at 477-78; *see also Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976) (striking down a statute mandating the death penalty for first-degree murder, which gave "no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense"). In *Commonwealth v. Felder*, 269 A.3d 1232 (Pa. 2022), we explained that "*Miller*'s bar on mandatory life-without-parole sentencing regimes 'is a prophylactic that entitles a juvenile homicide offender to a certain sentencing process, but not a particular sentencing outcome.'" *Id*. at 1245 (quoting *United States v. Grant*, 9 F.4th 186, 193 (3d Cir. 2021)). The same is true here. It will be for the sentencing court on remand to determine Appellant's sentence, and nothing in this Court's present decision precludes life without parole imposed as a discretionary exercise of that court.

Separately, in reaching its holding the majority asks whether mandatory life imprisonment without parole advances the traditional penological goal of deterrence. It is self-evident that the harsher the penalty, the greater its deterrent effect. In any event, a greater penalty will not have a lesser deterrent effect. *Cf. Gregg v. Georgia*, 428 U.S. 153, 186 (1976) (stating that, while some people will not be deterred from committing a capital offense by the death penalty, for many others the penalty is a "significant deterrent"). The majority expresses, however, that in the present context, a harsher penalty has *reduced* deterrence. *See* Majority Op. at 67. The majority reasons from the premise that deterrence requires "escalating consequences for escalating [criminal] severity," *id*. at 67, but I view that as a faulty premise. Deterring people from committing second-degree murder does not require that its prescribed punishment be less severe than the penalty attached to first-degree murder. All that matters is the punishment for

second-degree murder. The harsher it is, the more people will be deterred from committing it. While the majority notes the actual killer's conduct *in killing the victim* "may be outside the control of the defendant," it overlooks that the defendant's decision to embark upon a predicate felony lies within the defendant's power. It seems straightforward that, if a person knows he will be sentenced to life without parole if the felony he elects to participate in leads to someone's death, he will be less likely to participate in the felony.

In closing, we are not moral philosophers; we decide issues of law. I am circumspect about some of the wording used in our prior cases that can be read to suggest we are more advanced, morally speaking, than our forebears. In a case involving the murder of a police officer during an armed robbery, we stated that retribution as a penological justification is "incongruous in an era of enlightenment." *Commonwealth v. Elliot*, 89 A.2d 782, 784 (Pa. 1952); *cf*. Majority Op. at 50 (positing that the concept of penological necessity has been "understood to evolve over time with the development of moral and scientific advancements"). Later, the Supreme Court held that the Eighth Amendment's text "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101 (1958) – a phrase we adopted as a litmus for Article I, Section 13.[3] This type of portrayal marshals to its aid an unsubstantiated assumption that our own modern society is more "enlightened," more "evolved," more "decent," more "mature" than past civilizations and societies. To my mind, the accuracy of this allusion to inevitable moral progress and suggestion of inherent superiority is neither empirically established nor sufficiently evident to constitute a premise that can validly support legal doctrine. It strikes me, rather, as an

---

[3] *See Commonwealth v. Zettlemoyer*, 454 A.2d 937, 968 (Pa. 1982); *Commonwealth v. Hairston*, 249 A.3d 1046, 1056 (Pa. 2021).

example of the fallacy of chronological snobbery.[4]  As a matter of constitutional reasoning, I find it more persuasive to analyze whether a challenged penalty is "cruel" for Section 13 purposes on its own terms, without an unearned assist from the presumption of inevitable moral progress and human improvement through evolution.[5]

---

[4] *See generally* A. J. Hoover, DON'T YOU BELIEVE IT, Ch. 10 (Moody Press 1982).

[5] I am not saying the majority does this.  My remarks are directed at some of the language used in our prior cases that are referenced by the majority.